## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| The SCO GROUP, INC., *et al.*,[1] | : | Case No. 07-11337 (KG) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Objection Deadline: 2/26/2010 at 4:00 p.m.** |
| | : | **Hearing Date: 3/5/2010 at 11:00 a.m.** |

**MOTION OF CHAPTER 11 TRUSTEE FOR ORDER (I) AUTHORIZING DEBTORS' ESTATES TO OBTAIN POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 363(c), 364(c), 364(e) AND 507(b); (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (III) GRANTING OTHER RELIEF**

Edward N. Cahn (the "Chapter 11 Trustee" or "Trustee"), in his capacity as Chapter 11 Trustee for The SCO Group, Inc. and SCO Operations, Inc. (collectively, the "Debtors"), by and through the undersigned counsel, respectfully represent:

### SUMMARY OF RELIEF REQUESTED

1.  By this motion (this "Motion"), the Trustee requests entry of a final order (the "Order"), pursuant to sections 105(a), 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*, authorizing the Debtors' estates to enter into a secured first priority credit facility, which shall consist of a loan to the Debtors in the aggregate

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) The SCO Group, Inc., a Delaware corporation, Fed. Tax Id. #2823; and (b) SCO Operations, Inc., a Delaware corporation, Fed. Tax Id. #7393.

maximum principal amount of $2,000,000 (as amended, modified and otherwise in effect from time to time, the "Credit Facility") substantially on the terms set forth in the Secured Super-Priority Credit Agreement among The SCO Group, Inc. and SCO Operations, Inc., jointly as borrowers, and Seung Ni Capital Partners, L.L.C., as agent and lender, and the other lenders from time to time party thereto (the "Lenders") (as amended, supplemented, or otherwise modified and in effect from time to time, the "Credit Agreement" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the Credit Facility, the "Credit Documents"). The terms of the Credit Facility are substantially set forth in the Credit Agreement attached hereto as **Exhibit A** and the proposed form of the order related thereto (the "Order") is attached hereto as **Exhibit B**.

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these proceedings and this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. The statutory predicates for the relief sought herein are Bankruptcy Code sections 105(a), 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

3. On September 14, 2007 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. On September 18, 2007, this Court entered the *Order Authorizing Joint Administration of Related Chapter 11 Cases: 07-11337 and 07-11338* [Docket No. 25]. The Debtors continued in the management and operation of their businesses and property as debtors

in possession pursuant to Bankruptcy Code sections 1107(a) and 1108 until August 25, 2009 (the "Appointment Date"), when this Court appointed a chapter 11 trustee.

5. In connection with contested motions to convert the Debtors' chapter 11 cases to chapter 7 cases, on or about July 27, 2009, this Court directed the United States Trustee to appoint a chapter 11 trustee.

6. On the Appointment Date, the Office of the United States Trustee filed its *Notice of Appointment of Edward N. Cahn, Esquire as Chapter 11 Trustee* [Docket No. 898] and, on the same day, this Court entered the *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 900].

## RELIEF REQUESTED

7. By this Motion, the Trustee requests that this Court (a) approve the entry into the Credit Facility by the Debtors' estates and authorization to borrow up to $2,000,000 thereunder; and (b) grant such other and related relief necessary. The Trustee submits that obtaining the relief requested herein is in the best interest of the Debtors, their estates and creditors and presents the best opportunity for the Debtors' estates to maximize value from their assets and their estates through these cases for the benefit of all stakeholders.

*Lenders*

8. The Trustee is advised that Seung Ni Capital Partners, L.L.C. is a newly formed entity formed by Ralph J. Yarro III ("Yarro") and was created for the purpose of providing post-petition financing to the Debtors. Since Yarro is the former Chairman of the Debtors' Board of Directors and the Debtors' largest shareholder, Yarro is an insider pursuant to Bankruptcy Code section 101(31). *See* 11 U.S.C. § 101(31). The Trustee represents that at all times the negotiations among the Trustee, his advisors and Yarro were at arms-length and in good faith.

9. In accordance with the Credit Agreement, additional Lenders may also make loans to the Debtors under the Credit Facility from time to time.

*The Credit Agreement*

10. The Trustee is requesting authorization to enter into the Credit Agreement. The following are excerpts of the pertinent terms of the Credit Agreement[2]:

> **SECTION 2.01**. Commitment. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees to make a portion of a loan to the Borrower on the Closing Date in the amount of that portion of the Loan Amount (the "Loan") set forth on Exhibit "A" to the Note. The total amount of such loan, including the Lender's portion thereof made hereunder, shall be defined here as the "Loan" for all purposes under this Agreement and the other Loan Documents. The total amount of the Loan shall be equal to the amount of Loan proceeds disbursed to the Borrower hereunder by the Lender and under duplicate originals of this Agreement by the other Lenders. Notwithstanding the foregoing, prior to and after the Entry Date of the Order, the aggregate principal amount of Loan from all Lenders and outstanding at any time shall not be less than Eight Hundred Thousand and 00/100 Dollars ($800,000.00) and shall not exceed Two Million and 00/100 Dollars ($2,000,000.00). The Lender's portion of the Commitment shall: (a) reduce to zero immediately after the borrowing of the Loan pursuant to this Section 2.01; and (b) terminate immediately and without further action on the Loan Termination Date. Amounts paid or prepaid in respect of Loan may not be re-borrowed.
>
> **SECTION 2.02**. Loan.
>
> (a) The Lender shall make a portion of the Loan in accordance with its Commitment, the amount of which is listed on Exhibit "A" to the Note.
>
> (b) The Lender shall make its portion of the Loan set forth on Exhibit "A" to the Note on the Closing date by wire transfer of immediately available funds to such account as the Borrower may designate in writing.
>
> **SECTION 2.04**. Basic Interest and Fees on Loan/Loan Fee.
>
> (a) Subject to the provisions of Section 2.05 hereof, the Loan shall bear Basic Interest (computed on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days).

---

[2] The description of the Credit Facility set forth herein are fully qualified by the Credit Agreement and the Order, and parties in interest are advised to review both of these documents in their entirety. Unless otherwise defined herein, all capitalized terms used in this description of the Credit Facility shall have the meanings ascribed to them in the Credit Documents.

(b) Basic Interest on the Loan shall be due and payable to the Lender on the Maturity Date, except as otherwise expressly provided in this Agreement or in the Note.

(c) The Borrower's obligation to pay the Loan Fee, including the Lender's portion thereof, shall survive prepayment or payment of the Note and other Obligations under this Credit Agreement.

(d) The Borrower acknowledges and agrees that its obligation to pay the Loan Fee is a material inducement to the Lender's desire and willingness to enter into this Agreement and the Loan Documents and to make the Loan pursuant thereto.

(e) The Borrower shall pay in full and in immediately available funds the Loan Fee on or before the Loan Fee Maturity Date.

**SECTION 2.05**. Late Charge/Default Interest. If an Event of Default under this Agreement or the other Loan Documents has occurred and is continuing after notice thereof, the Borrower shall: (a) on demand from the Lender pay a late charge equal to five percent (5%) of any past-due amount owed hereunder; and (b) on demand from time to time pay Basic Interest, in all cases, at the rate otherwise applicable to the Loan pursuant to Section 2.04, plus six percent (6.00%) per annum until such Event of Default is cured in accordance with this Agreement.

**SECTION 2.06**. Termination and Reduction of Commitment.

(a) The Commitment shall automatically terminate on the Loan Termination Date.

(b) Upon at least one (1) Business Day's prior irrevocable written or fax notice to the Lender, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Commitment.

**SECTION 2.07**. Repayment of Loan.

(a) The Note shall require that, to the extent not previously paid, the principal of the Loan, all Basic Interest and all other amounts due under the Note (other than the payment of the Loan Fee), shall be due and payable on the Maturity Date, and that the Loan Fee shall be due and payable in full on the Loan Fee Maturity Date.

(b) All repayments pursuant to this Section 2.07 shall be without premium or penalty, except for any Default Interest and any other amounts due under the Note and except for payment of the Loan Fee.

**SECTION 2.08**. Voluntary Prepayment.

(a) The Borrower shall have the right at any time and from time to time to make a Voluntary Prepayment of all or any portion of the principal amount owed under the Loan, upon at least one Business Day's prior written or fax notice (or telephone notice promptly confirmed by written or fax notice), to the Lender before 12:00 (noon), New York City time; provided, however, that each partial prepayment shall be in an amount that is a multiple of $10,000, and further provided that Borrower's obligation to pay the Loan Fee shall survive prepayment

5

of the Loan until the Litigation Proceeds have become available from which the Loan Fee shall be paid in accordance with the Note.

(b)     Each notice of Voluntary Prepayment: (i) shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid; and (ii) shall be irrevocable and shall commit the Borrower to prepay the Loan by the amount stated therein on the date stated therein. All prepayments under this Section 2.08 shall be without premium or penalty.

**SECTION 2.09**. Payments.

(a)     The Borrower shall make each payment (including costs owned hereunder, principal, Basic Interest, Default Interest, the Loan Fee and all other amounts due under the Note) hereunder, under any other Loan Document and, to the extent payable to the Lender, under the Order, not later than 1:00 p.m., New York City time, on the date when due in immediately available funds, without setoff, defense or counterclaim.  Each such payment shall be made to the Lender at an address and account identified in writing by the Lender.

(b)     Except as otherwise expressly provided herein, whenever any payment (including principal of or Basic Interest and any Default Interest owed on any Loan or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of Basic Interest and Default Interest, if applicable.

(c)     Except for a Voluntary Prepayment, all other payments due under the Note and hereunder shall first be applied to any costs owed under the Note or the other Loan Documents, then to accrued Basic Interest and any Default Interest owed on the principal amount being prepaid to the date of payment, and then to the principal amount owed.

**SECTION 3.06**. Use of Proceeds.  The Borrower will use the proceeds of the Loan solely: to pay fees and expenses related to the administration of the Bankruptcy Case, the operation of the Debtors and the costs related to the Litigation and the consummation of the Transactions contemplated by and subject to the terms of this Agreement. The Borrower shall use the entire amount of the proceeds of each Loan solely in accordance with this Section 3.06; provided, however, that nothing herein shall in any way prejudice or prevent the Lender from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under clause (a) of Section 105, or Section 330 or 331 of the Bankruptcy Code, by any party in interest.  For avoidance of doubt, no proceeds of the Loan or any cash collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lender.

**SECTION 3.09**. Secured, Super-Priority Obligations.

6

(a)     On and after the Closing Date and pursuant to the Order, the provisions of the Loan Documents are effective to create in favor of the Lenders, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Order) in all right, title and interest in the Collateral, enforceable against the Borrower.

(b)     Pursuant to the Order, all Obligations will be secured and the Collateral shall be encumbered by valid and perfected first-position liens and security interests, subject only to the Requisite Priority.

(c)     Pursuant to clause (c)(1) of Section 364 of the Bankruptcy Code and the Order, all obligations of the Borrower under the Loan Documents (including any exposure of the Lender in respect of cash management or hedging transactions incurred on behalf of the Borrower) at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case having priority over all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code.

(d)     The Order and the transactions contemplated thereby and the Transactions contemplated hereby are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Lender.

**SECTION 5.10**.  Use of Loan Proceeds/Sale of Core Assets/Use of Proceeds from Sale of Core Asset and Other Assets.

(a)     Notwithstanding any other provision hereof or of the other Loan Documents, the Borrower may deposit up to fifty percent (50%) of the Loan proceeds into a segregated account to be used to pay past and ongoing Litigation trial costs and litigation related expenses of the Trustee, including the payment of the reasonable compensation expense of retaining Messrs. Tibbitts and Broderick, both SCO employees, to assist in the Litigation.  The remaining fifty percent (50%) of the Loan proceeds may be used for SCO operational expenses, including, without limitation, unpaid administration expenses of the SCO Estates in the Trustee's discretion.

(b)     The Borrower may without the prior consent of, but with prior written notice to, Lender also retain and use fifty percent (50%) of the net proceeds (defined as gross proceeds from one or more Core Asset Sale(s), less the direct and reasonable closing fees and expenses of the sale or license transaction) from any Core Asset Sales and one hundred percent (100%) of the proceeds from the sale of all other SCO assets (excluding the sale of any rights in the Litigation and/or any portion of the Litigation proceeds), but the Borrower shall at the time of any such Core Assets Sale(s) pay the remaining fifty percent (50%) of such net  sales or license proceeds toward retirement and payment of the amount due under the Note.  Such Note payments shall not be credited toward payment of the Loan Fee.

(c)     Notwithstanding anything to the contrary in this agreement or any of the Loan Documents, Borrower shall have the right to use ordinary course cash collateral arising and existing from Borrower's operation of SCO's business during the Bankruptcy Case.

7

**SECTION 6.07**. Transactions with Affiliates.  Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that:

(a)     the Borrower may engage in any of the foregoing transactions in the ordinary course of business;

(b)     Restricted Payments may be made to the extent provided in Section 6.06; and

(c)     loans may be made and other transactions may be entered into between and among the Borrower and its Affiliates in the ordinary course of its business or to the extent permitted by Sections 6.01 and 6.04.

**SECTION 6.11**. Chapter 11 Claims.  Incur, create, assume or permit to exist any administrative expense, unsecured claim, or other super-priority claim or lien that is pari passu with or senior to the claims of the Lender against the Borrower.

**SECTION 6.13**. Right of First Refusal for Additional Indebtedness.  The Borrower has agreed to certain restrictions set forth herein with respect to incurring additional Indebtedness herein.  Should the Borrower incur additional Indebtedness from another Person other than the Lender on terms that are more expensive than the terms of the Loan hereunder, then the terms of the Loan shall be automatically modified and increased to be equal to the terms of such additional Indebtedness.  In connection with and as result of obtaining such additional Indebtedness, Lender's right to receive the Loan Fee from the Litigation Proceeds shall not be diluted or otherwise reduced or diminished.

**EVENTS OF DEFAULT.**  In case of the happening of any of the following events (each, an "Event of Default" and together, "Events of Default"):

(a)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)     default shall be made in the payment of any Basic Interest or Default Interest on any Loan or any fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days after Borrower receives such notice;

(d)     default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in: (i) Section 5.03(a) or (c), and such failure shall continue unremedied for five (5) Business Days; or (ii) Section 5.04, 5.06 and 5.10 or Article VI, and such default shall remain unremedied for a period of ten (10) Business Days ;

(e)     default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of thirty (30) days after notice thereof from the Lender to the Borrower;

(f)     the Borrower shall fail to pay any principal, Basic Interest or Default Interest or any other amount due under any Loan, regardless of amount, or any other amount due in respect of any Indebtedness arising after the Petition Date (other than the Obligations), when and as the same shall become due and payable;

(g)     an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $100,000;

(h)     (i) The Loan Documents and the Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Section 364 of the Bankruptcy Code against the Borrower, or the Borrower shall so allege in any pleading filed in any court or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or the Borrower shall so state in writing; or (ii) the Borrower shall file a complaint or initiate any other action against the Lender or any entity shall obtain a judgment that affects the Lender's claims or the Collateral, except to the extent expressly allowed in the Order;

(i)     Either of the cases constituting the Bankruptcy Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of either of the cases constituting the Bankruptcy Case), suspended or converted to a case under Chapter 7 of the Bankruptcy Code, or the Borrower shall file any pleading requesting any such relief; or an application shall be filed by the Borrower for the approval of, or there shall arise: (i) any other claim having priority senior to or pari passu with the claims of the Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or the additional Indebtedness permitted hereunder; or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein;

(j)     The Trustee resigns, is removed, becomes incapacitated or otherwise becomes unable to perform his duties under the Bankruptcy Code and a new Trustee not reasonably acceptable to Lender is appointed by the Bankruptcy Court;

(k)     (i) the Order shall: (i) not have been entered by the Bankruptcy Court on or before the thirtieth (30th) day following the Closing Date; (ii) from and after the date of entry thereof, the Order shall cease to be in full force and effect; (iii) the Borrower shall fail to comply with the terms of the Order in any material respect; or (iv) the Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Borrower shall apply for authority to do so) without the written consent of the Lender in a manner that has a Material Adverse Effect on Lender and/or not provided for in this Agreement and/or the other Loan Documents;

9

(l)  the Borrower shall file a motion seeking, or the Bankruptcy Court shall enter, an order: (i) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets; or (ii) except to the extent the same would not constitute a Default hereunder, approving any settlement or other stipulation with any creditor of the Borrower, other than the Lender without the Lender's consent, which shall not be unreasonably withheld;

(m)  claims arising under Section 506(c) of the Bankruptcy Code shall be asserted against the Lender by the Borrower or other actions adverse to the Lender or its rights and remedies hereunder or under any other Loan Document or any Bankruptcy Court order shall be commenced by the Borrower;

(n)  after the Effective Date, there shall occur any event or circumstances (or series of events or circumstances) that has a Material Adverse Effect in the aggregate since the Effective Date;

(o)  the Borrower shall consummate a sale or license of all or substantially all of SCO Assets without the consent of the Lender not otherwise permitted by this Agreement; or

(p)  the Litigation Proceeds are not sufficient to repay the Loan Fee in full on or before the Loan Fee Maturity Date and all other amounts owed to creditors with rights senior to those held by the Lender hereunder and under the Loan Documents

### *Compliance with Local Rule 4001-2*

11.  In accordance with Local Rule 4001-2(a)(i), the Trustee highlights for this Court the following provisions included in the Credit Agreement:

- Local Rule 4001-2(a)(i)(A): The Motion and the Credit Documents do not contemplate the cross-collateralization of pre-petition and post-petition obligations.

- Local Rule 4001-2(a)(i)(B): The Order does not contemplate the acknowledgement of the Debtors with respect to the validity, enforceability and perfection of any pre-petition liens which would be binding on the Debtors or their estates.

- Local Rule 4001-2(a)(i)(C): The Credit Documents do not contemplate waiver, without notice of the estates' rights under 11 U.S.C. § 506(c).

- Local Rule 4001-2(a)(i)(D): The Motion and the Credit Documents do not seek to grant any liens on the Debtors' chapter 5 rights and remedies to any pre-petition secured lender.

- Local Rule 4001-2(a)(i)(E): The Motion and Credit Documents do not contemplate or seek to deem pre-petition secured debt to be post-petition secured debt, or contemplate the use of post-petition loans from a pre-petition secured creditor to pay part or all of any such pre-petition creditor's debt.

- Local Rule 4001-2(a)(i)(F): The Motion and the Credit Documents do not propose disparate treatment for professionals retained by a statutorily appointed creditors' committee, if any, from professionals retained by the Debtors with respect to a professional fee carve-out.

- Local Rule 4001-2(a)(i)(G): The Motion and the Credit Documents do not propose to prime any known secured liens without the consent of such lien holder.

## APPLICABLE AUTHORITY

12. Bankruptcy Code section 363 governs a trustee's use of property of a debtor's estate. Bankruptcy Code section 363(c)(1) provides that:

> If the business of the debtor is authorized to be operated under section…1108…of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

13. Bankruptcy Code section 363(c)(2), however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in Bankruptcy Code section 363. Specifically, a trustee may not use, sell or lease "cash collateral" under subsection (c)(1) unless:

(A) each entity that has an interest in such collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

14. Consistent with the Credit Agreement and the Order, the Lenders has expressly consented to the use of any cash collateral (satisfying the requirements of Bankruptcy Code section 363(c)(2)(A)).

11

*Need to Use Cash Collateral*

15. This Motion proposes the use of the loan amount(s) under the Credit Facility, in order to fund ongoing working capital needs, Litigation (as defined in the Credit Agreement) related costs, and to provide ongoing liquidity. In addition to the access to the funding being provided by under the Credit Facility, it is imperative that the Trustee also have authority to use cash collateral subject to the terms of the Credit Agreement. Accordingly, in order to avoid immediate and irreparable harm to the Debtors' businesses and their estates, the Trustee has an immediate need for authority to use cash collateral.

*Credit Facility Should be Approved*

16. The Trustee proposes to obtain financing under the Credit Facility by providing security interests and liens as set forth above pursuant to Bankruptcy Code sections 364(c). The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the trustee is "unable to obtain unsecured credit allowable under section 503(b)(1) of this title." 11 U.S.C. § 364(c). Indeed, section 364(c) financing is appropriate when the trustee is unable to obtain credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 11 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code sections 364(a) and (b); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr E.D. Pa. 1987) (secured credit under Bankruptcy Code section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

17. Courts have applied the following three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code section 364(c):

    a) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

> b) the credit transaction is necessary to preserve the assets of the estate; and
>
> c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549.

18. The Trustee's financial advisor has endeavored to identify potential sources of postpetition financing. Based on discussions with potential lenders, the Trustee's professionals have determined that adequate postpetition financing on an unsecured basis is not available. As discussed below, each of these elements is satisfied. Without postpetition financing, the Trustee would be unable to operate the Debtors' businesses as a going concern, which would significantly impair the value of their assets to the detriment of all stakeholders. Furthermore, by obtaining postpetition financing, the Debtors' estates will be in a position to preserve and maximize the value of their assets for the benefit of all creditors. Finally, the terms of the Credit Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

*No Adequate Alternative to the Credit Facility is Currently Available*

19. A trustee need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code sections 364(c) and (d). *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

20. For over four months, the Trustee's financial advisor pursued efforts to find financing that would provide additional funding and in that regard contacted a number of potential lenders with the capability of providing a credit facility. In connection with those efforts, the Trustee and its advisors received only one other proposals from a potential lender.

13

As a result of and under the circumstances, the Trustee determined that the instant Credit Facility was the best proposal received by his financial advisors. Accordingly, the Trustee has satisfied the requirement of Bankruptcy Code section 364(c) that alternative credit on more favorable terms was unavailable to the Debtors' estates.

*The Credit Facility Terms are Fair, Reasonable and Appropriate*

21. The proposed terms of the Credit Facility and the other Credit Documents are fair, reasonable, and adequate under the circumstances. First and foremost, as discussed more fully above, the Trustee's financial advisor has made a concerted, good-faith effort to obtain credit on the most favorable terms currently available given the circumstances. Although the Trustee's financial advisor contacted various alternate lending institutions, no other lender was willing to provide an adequate financing facility.

22. Against this backdrop, the Trustee's professionals carefully evaluated the proposed financing structure from the Lenders, engaged in negotiations with the Lenders regarding a term sheet and the Credit Documents and determined that the Lenders' proposal was best suited to the needs of the Debtors' estates given the circumstances. Moreover, the terms and conditions of the Credit Facility were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors' estates to meet ongoing corporate and working capital requirements and costs of the Litigation and will help preserve and maximize the value of the Debtors' estates.

23. Accordingly, given the circumstances, the terms of the Credit Facility are fair, reasonable and adequate, and the Lenders under the Credit Facility should be accorded the benefits of Bankruptcy Code section 364(e) in respect of such agreement.

*The Automatic Stay Should Be Modified on a Limited Basis*

24. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors' estates to grant the security interests, liens, and super-priority claims to the Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. The Trustee further requests that the automatic stay be vacated and modified, to the extent necessary, to permit the Lenders to exercise, immediately upon the occurrence of an Event of Default or otherwise as prescribed therein, all rights and remedies under the Credit Documents or the Order, as applicable.

25. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Trustee's business judgment, are reasonable and fair under the present circumstances.

## **NOTICE**

26. Notice of this Motion has been provided to: (a) the Office of the United States Trustee; (b) counsel to the Lenders ; and (c) all parties that have requested notice pursuant to Bankruptcy Rule 2002. The Trustee submits that no other or further notice need be provided.

## **NO PRIOR REQUEST**

27. No prior motion for the relief requested herein has been made to this or any other court.

133091.01600/40185605v.3

**WHEREFORE**, the Trustee respectfully requests that this Court enter a final order granting the relief requested herein, and granting such other and further relief as is just, proper and necessary.

Dated: February 17, 2010                  **BLANK ROME LLP**

*/s/ Bonnie Glantz Fatell*
Bonnie Glantz Fatell (DE No. 3809)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400

Counsel to Edward N. Cahn, Chapter 11 Trustee for The SCO Group, Inc., et al.