# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| The SCO Group, Inc., et al., | ) | |
| | ) | Case No. 07-11337 (KG) |
| Debtors. | ) | (Jointly Administered) |
| | | Ref. Docket No. 1051 |

**Objection Deadline: February 26, 2010 at 4:00 p.m. (prevailing Eastern time)**
**Hearing: March 5, 2010 at 11:00 a.m. (prevailing Eastern time)**

## NOVELL'S OPPOSITION TO THE TRUSTEE'S
## MOTION FOR POSTPETITION FINANCING

Novell, Inc. and SUSE Linux GmbH (together, "Novell") hereby objects to the Motion of Chapter 11 Trustee for Order (I) Authorizing Debtor's Estates to Obtain Postpetition Financing [etc.] (filed February 18, 2010) (the "Motion") of Edward N. Cahn, as chapter 11 trustee (the "Trustee") of debtors The SCO Group, Inc., and SCO Operations, Inc. (together, "SCO" or the "Debtors"). By the Motion, the Trustee asks the Court to approve very costly, super-priority financing to be used only for funding litigation against Novell and International Business Machines Corporation and for payment of post petition expenses; none of the proceeds is set aside for payment of prepetition creditors. Novell asks this Court to approve the proposed financing, if at all, only after careful consideration of the issues it raises and only on terms that protect Novell as a creditor and other creditors.

### I. BACKGROUND

1. At the beginning of these cases, and as recently as September of 2008, the Debtors claimed that they could pay creditors in full.[1] Since that time, as the Debtors (and now the Trustee) have pursued bet-the-company litigation against Novell and International Business Machines Corporation ("IBM") at any cost, the estates steadily have shrunk. The Motion

---

[1] The Debtors made the same claim just last summer in connection with their motion to sell that responded to the motions to convert of Novell and others. But by that time, and with all that had happened in between, no one was taking those claims seriously any more.

represents the inevitable outcome of this unabated focus on the perceived prospect of a major win in the litigation, for if the Motion is granted, the creditors surely will recover *nothing* unless the litigation succeeds. Novell submits that putting this last nail in the creditors' (and it is one of those creditors along with being a litigant) coffin when there are other alternatives, simply cannot be justified, especially since the real beneficiaries of the Trustee's gamble are SCO's owners. The propriety of the proposed financing is even more dubious in light of other questions and issues the Motion raises.

2. From the September 2007 outset of these chapter 11 cases, the Debtors' position was that all creditors would be paid in full no matter what. On April 2, 2008, they told this Court in connection with an abortive proposed plan of reorganization, "The only people who should care about these metrics and the other things will be the stockholders and perhaps Mr. McMahon or the U.S. Trustee because creditors will be getting cash on the barrel at the point of confirmation, so why do they care?" (4/2/08 Tr. 11:6-10).[2] Five months (and more missteps) later, they were still saying the same thing: "We always have intended to pay them [the creditors, including Novell] in full. We still can pay them in full, [even] if the worse [sic] should happen." (9/16/08 Tr. 88:19-25). On that occasion, the Court granted them a further extension of exclusivity based in part on that representation.

3. By the time IBM, Novell and the United States Trustee made their motions to convert the cases in the Spring of 2009, it was clear that payment in full of creditors was a vanished dream absent a breakthrough result in the litigation. As Novell wrote,

> As Novell and others pointed out, however, despite their repeated promises to propose a confirmable plan, the Debtors not only have failed to do so, but have lost $8.65 million since the Debtors filed these cases on business operations alone. . . .
>
> . . . .
>
> Novell's counsel observed at the March 30 hearing that these losses mean that unless the Debtors some day achieve a fantastic

---

[2] "Tr." refers to "Transcript".

> win in the Novell litigation, the Debtors will be unable to pay creditors in full. (3/30/09 Tr. 20:3-21.) That is because the Debtors now show total assets of $8.3 million, of which the most important (Unrestricted Cash of $728,537, net Accounts Receivable of $1.4 million) total but $2.1 million; by contrast the Debtors state that prepetition liabilities (*without* the still-unliquidated claims of IBM or others in litigation with them) total $6.9 million and postpetition liabilities total $4.84 million. (March 31, 2009 MOR, Balance Sheet.) Similarly, the Debtors report that their assets have declined almost 50% since the filing of the cases from $15 million to the present $8.3 million, while their *prepetition* liabilities have *increased* almost fourfold from $1.9 million to the present $6.9 million (evidently, the Debtors have chosen not to reflect large unliquidated liabilities in their reporting). (*Id.*)

(Novell's Motion for Conversion (filed May 11, 2009) (the "Motion to Convert") 8-9; *see also* Memorandum Opinion (filed August 5, 2009) (the "Conversion Opinion") 6.) In granting the motions to dismiss, the Court observed:

> These bankruptcy cases have been pending for 23 months. Were the Court to approve the Sale Motion [which the Debtors had used to try to counter the motions to dismiss], Debtors [sic] sole business would be the Litigation . . . . [A]ll that the Debtors would have to show for their millions of dollars of post-petition losses is the Litigation. The Court is now unwilling to continue to wait while the Debtors' losses mount . . . .

(Conversion Opinion 9.) Elsewhere in the same decision, the Court wrote that the Debtors' losses were "staggering." (*Id.* at 11.) The Court concluded, "[T]he Court must take action to protect the estate *and its creditors*. The outcome and time to reach finality of the Litigation are both too uncertain, while the continuing losses are not." (*Id*. at 9 (emphasis added).)

4. Unfortunately, it is clear that the estate's resources nevertheless have continued to dwindle since the Trustee was appointed. The Trustee has only just filed the October 2009 monthly operating reports. The Debtors' assets had shriveled to $6.7 million from the $8.3 million reported in March of 2009, unrestricted cash had declined from $728,537 in March to just $397,912, and losses on operations before reorganization costs had swollen from $8.65 in March to $10.667 million.[3] And although the results for November, December and January are

---
[3] The Debtors' accounts receivable appear to have held at $1.4 million.

as yet still unreported by the Trustee, there is no reason to believe that things have gotten anything but worse.

## II.  THE FINANACING

5.  And they are about to get potentially a lot worse – indeed, as bad as they can be: hopeless – for general unsecured creditors if the Court grants the Motion.  Here is a summary of the most important features of the credit facility for which the Motion seeks approval:

> <u>Lender</u>.  The lender is a "newly-formed" entity called Seung Ni Capital Partners, L.L.C. ("SNCP").  The Motion identifies Ralph Yarro, the Debtors' former Chairman, as the person who formed SNCP.  The Motion does not disclose who the members of SNCP are or where SNCP's money is coming from.
>
> <u>Amount and Use</u>.  The Motion asks the Court for authority to borrow up to $2 million for the purposes of:  (1) funding the Novell and IBM litigation, including payment of Messrs. Tibbitts and Broderick to help with it; and (2) payment of expenses of administration of the chapter 11 case.  *It does not provide for use of the proceeds to pay any prepetition claims.*  The lenders can reduce the $2 million commitment at its sole pleasure upon one days' notice.
>
> <u>Lien and Priority</u>.  The lender will be granted a super-priority lien in virtually all of SCO's assets.  It will also be granted a super-priority expense of administration claim (giving it the right to first payment of cash if the lien otherwise proves inadequate for repayment in full).
>
> <u>Cost</u>.  There are two principal components to the cost of the loan:
>
>> **Interest and Related Charges.**  Basic interest is 6.6% per annum.  Default interest adds another 6%.  There is also a late charge of 5% of any defaulted payment.
>>
>> **Loan Fee.**  The credit agreement provides for a "Loan Fee" that is payable come hell or high water (absent a default by the lender) *in addition to* the amount of the loan and interest or other charges. The fee really is an investment. It is 6.6% of what might be called the lender's supported share of any recovery of any kind whatsoever in the litigation by settlement or judgment, including such items as attorneys' fees awarded to SCO.  Specifically, it is 6.6% of:  (a) the percentage of the $2 million commitment that the lenders actually lend TIMES (b) the gross recovery in the litigation.  In the example used in the Motion, if the lenders

actually lend $1.5 million of the $2 million commitment and the gross litigation recovery is $25 million, the "fee" is $1,237,500.

**Other.** The credit agreement also has a kind of most favored nation provision that automatically modifies the terms of the loan to match any "more expensive" terms that the Trustee may obtain from any other lender in the future.

<u>Repayment</u>.

**Basic Loan.** The Trustee must repay the loan and all interest upon maturity, default, dismissal or conversion of the bankruptcies to chapter 7, or the resignation or incapacity of the Trustee unless a person acceptable to the lender is appointed to replace him. Maturity is October 31, 2011. In addition, the Trustee must use the proceeds of any sale of "Core Assets" – assets other than the litigation – to pay down any existing loan indebtedness whenever any such sale occurs.

**Loan Fee.** The Loan Fee must be paid when the litigation proceeds become available.

### III. ANALYSIS

6. From these terms and in light of what is known for sure about the estates' condition, it is crystal clear that if the Trustee loses the litigation or manages only a middling judgment, there will be absolutely nothing with which to pay general unsecured creditors (including Novell, which has a claim of around $3 million). Already, as of the October 2009 monthly operating reports, at best the estates could pay unsecured creditors only a miniscule dividend out of existing cash. Nor does it appear that the cash will be augmented in any material way. So far the Trustee has been unable in his six full months in office to sell any of the estates' assets to generate any other funds. If the Motion is granted but the litigation fails to produce meaningful results, even the little that is left will be subject to super-priority lien and claim for to $2 million or more. Creditors, who were told that they would be paid in full as recently as September of 2008, will be blanked.

7. Such a result is inequitable. It improperly shifts the risk of the litigation from equity to creditors.

8. The main purpose of the loan contemplated by the Motion is funding the litigation. Who benefits by this gamble? Nominally, the creditors may if the gamble succeeds materially, since they might recover more than what they could possibly recover now after the Debtors and Trustee have spent their money chasing the litigation for the last 30 months or so. But if the litigation fails, then the unsecured creditors are the losers because they will get nothing. In short, their upside is limited (and they never should have even had to worry about an upside had the cases been conducted properly), and their downside is a total washout.

9. The real beneficiaries of the risk are the holders of the Debtors' equity, including Mr. Yarro, who Novell believes is a major shareholder.[4] Both the Debtors and now the Trustee have been willing to risk the creditors' recovery essentially for the benefit of equity. If the litigation thrives, equity stands to profit. If the case miscarries (or even enjoys only limited success), however, equity largely is no worse off than it was before the chapter 11 cases were filed.

10. Equity should not thus get a free ride speculating on the litigation at the creditors' expense. If the claims in the litigation are so valuable, those who will benefit most by them – equity – should have been willing long go to buy them from the estates. But equity has not done so. And the reason why that is so is obvious: why should equity spend a penny to exploit the litigation if it can get the Debtors, estates and Trustee to pay for the opportunity with the creditors' money, instead? This situation begs an answer to the question, "If the gamble on litigation flops, who will protect the creditors against the use of their money?" Certainly, equity has not offered to do that, and the Trustee has not made any arrangements for that purpose, either.

11. Novell submits that it is time to end this *de facto* subordination of the rights of creditors to equity. It is contrary to the priority of creditors over equity in bankruptcy. *See, e.g.,*

---

[4] As of September 13, 2007, the Debtors certified that Mr. Yarro personally owned in the aggregate 5,505,949 shares of stock in the SCO Group, Inc. – making him the company's largest individual shareholder by a wide margin. *See* Certification Concerning Equity Security Holders, filed with The SCO Group, Inc.'s voluntary petition [Docket No. 1].

Bankruptcy Code §§ 727(a), 1129(b)(2). It is still possible that a sale of portions of the Debtors' business (or a reasonable settlement that is based upon protecting the creditors rather than catering to equity's dreams of a litigation gold mine) could produce some proceeds that might help the creditors materially (and perhaps even equity), but only if those assets are not subjected to a super-priority lien and claim for up to $2 million more.

    12. The Motion also presents various disclosure issues:

> A. The loan's terms are *very* oppressive. For example, the so-called "Loan Fee", entitling the lender to a fixed percentage of any litigation proceeds, is really an investment in the litigation, not a typical loan fee based on the amount of the loan. Moreover, that percentage is not *de minimis*.[5] But the Motion does not detail these important terms. And it simply quotes many of the major terms at length rather than summarizing them (that is, providing something of a road map) and referring the reader to the relevant sections in the attached copy of the credit agreement. *See* Fed. R. Bankr. P. 4001(c)(1)(B). Only by reading the transactional documents would a reader have a full appreciate for, e.g., the significance of the Loan Fee.

> B. There is no information on the lender, SNCP, other than that it is "newly formed" and that former SCO chairman Ralph Yarro is associated with it. Questions such as who are its members and what if any is their relationship to the Debtors, what are its financial resources, and whether there are any side deals or understandings remain unaddressed and unanswered,[6] in a manner that is frustratingly reminiscent of prior forays of the Debtors. (*See, e.g., the* Debtors' Joint Plan of Reorganization; Motion to Convert 4-5; Conversion Opinion 6; Debtors' Motion to Sell Property Outside the Ordinary Course of Business [etc.] (dated and filed June 22, 2009) (Stephen Norris signatory to agreement on behalf of buyer

---

[5] For sake of example, if the Debtors were to win the $5 billion judgment from IBM that they have demanded, and if SNCP actually lent $2 million to the Debtors, SNCP's Loan Fee would be *$330 million* for making this $2 million loan. Even assuming a judgment against IBM much more consonant with the boundaries of possibility, let alone reality, say, $50 million, SNCP would get, in addition to its interest, a "loan fee" of $3 million for its $2 million loan, plus all fees and expenses of SNCP (with any fees and expenses in excess of $50,000 further diluting the Litigation Proceeds).

[6] A recent check of the Delaware Secretary of State's records online does not disclose the formation of SNCP. The Court will recall an earlier incident where the Debtors promoted a deal with an new entity that also had not, in fact, been formed yet.

UNIXIS); Conversion Opinion 9-10 (Court doubts "parties' good faith".)

    C. The Motion claims that its request for super-priority status for the lender is justified because the Trustee could not find any better terms, but it fails to detail the Trustee's efforts. If the claims in the litigation were so promising as to warrant risking the creditors' potential recoveries (if such a risk *ever* were warranted), that the terms of the Motion's credit agreement are the best the Trustee could generate calls for some persuasive evidence.[7]

    D. The Motion supplies no *current* financial about the estates, and the most recent information available is in the October 2009 MORs, the most recent reports available, but which are a full calendar quarter short of being current. Though as Novell has indicated above, the chances are that there is virtually nothing left in the estates, the Trustee nevertheless should be required to provide contemporary financial information about the estates to support his claim that there is no other way to finance the Debtors than through the terms of the Motion.

13. Finally, it bears adding that the lender, SNCP, is also in essence speculating for its benefit at the expense of creditors by getting a super-priority lien and claim to protect its investment in the litigation that will wipe out the creditors if the litigation fails. SNCP is, in essence, using the creditors' money to support the litigation for its own profit, a profit that could be quite handsome, indeed. Moreover, this opportunity for SNCP is virtually risk free. If the Debtors fail in their litigation, SNCP has a super-priority claim for the total amount loaned (plus all of SNCP's fees and expenses) that is senior to all other creditors (including Novell).[8] Moreover, the Motion provides SNCP with virtually friction-free remedies for a default by

---

[7] Indeed, it is ironic that after six months in office with the assistance of capable counsel and professional advisors (Ocean Park) of his choosing, the Trustee has neither been able to sell any of the Debtors' assets nor find reasonable financing. After all, the Debtors convinced this Court to allow them to stay in control by claiming that if they were successful in the Tenth Circuit, investors and lenders would flood out of the woodwork. Of course, that has not happened. The Trustee has not sold any assets and has been unable to find any financing except from an entity affiliated with a long-time insider on the most egregious terms, entity that, moreover, may be related to Stephen Norris Capital Partners (note the identical initials – SNCP), a party that has been in the background throughout these proceedings waiting for a moment of weakness to capitalize on the Debtors' (and now the Trustee's) financial distress and anxiety to prosecute the litigation.

[8] Hence, Mr. Yarro benefits not only as an insider/shareholder if the litigation succeeds, but as a lender even if it does not. If there are other shareholders who also are affiliated with SNCP, the same will be true of them.

supplying advance stay relief that, arguably, would be available even on a loss in the litigation since that result might constitute a Material Adverse Effect that gives rise to an Event of Default. This virtual gift to SNCP at the creditors' expense is inequitable, too.

## CONCLUSION

The Motion is probably the last opportunity for the Court to take steps to protect creditors in case the litigation central to the Debtors' and Trustee's concept of the purpose of these cases proves unsuccessful. Novell respectfully submits that the Court should not approve the Motion unless a reliable mechanism is established for ensuring that creditors get paid no matter the outcome of the litigation. In any event, the Court should deny the Motion until after there is proper disclosure and an evaluation of the propriety of its terms.

Dated: February 26, 2010
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

  /s/ Sean T. Greecher
James L. Patton (No. 2202)
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
Telephone (302) 571-6600

-- and --

MORRISON & FOERSTER LLP
Adam A. Lewis
425 Market Street
San Francisco, California 94105-2482
Telephone (415) 268-7000

-- and --

MORRISON & FOERSTER LLP
Larren M. Nashelsky
1290 Avenue of the Americas
New York, New York 10104-0050
Telephone (212) 468-8000

Counsel for Novell, Inc. and SUSE GmbH