# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| The SCO GROUP, INC., *et al.*, [1] | : | Case No. 07-11337 (KG) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Hearing Date: 8/23/2010 at 3:00 p.m. (ET)** |
| | | **Objection Deadline: 8/16/2010 at 4:00 p.m. (ET)** |

**MOTION OF THE CHAPTER 11 TRUSTEE FOR ORDER (1) AUTHORIZING THE MARKETING, AUCTION AND SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' SOFTWARE BUSINESS ASSETS CONSISTENT WITH FORM ASSET PURCHASE AGREEMENT AND FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (2) AUTHORIZING ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (3) APPROVING BIDDING PROCEDURES IN CONNECTION WITH AUCTION, (4) ESTABLISHING SALE HEARING DATE AND (5) GRANTING RELATED RELIEF**

Edward N. Cahn, Esq. (the "**Chapter 11 Trustee**" or "**Trustee**"), in his capacity as Chapter 11 Trustee for the above-captioned debtors (collectively, the "**Debtors**") hereby moves this Court (this "**Motion**") for entry of an order (1) authorizing the marketing, auction and sale of substantially all of the Debtors' software business assets (collectively, the "**Acquired Assets**") consistent with the terms of the form *Asset Purchase Agreement* attached hereto as Exhibit "1" (the "**Form APA**") free and clear of all liens, claims and encumbrances (2) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases, (3) approving bidding procedures ("**Bidding Procedures**") in connection with an auction (the "**Auction**") of the Acquired Assets, (4) establishing a hearing date for any transaction(s) resulting from the Auction (the "**Sale Hearing**") and (5) granting related relief (the "**Sale Procedures Order**").  In support of this Motion, the Trustee respectfully states as follows:

---

[1]  The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows:  (a) The SCO Group, Inc., a Delaware corporation, Fed. Tax Id. #2823; and (b) SCO Operations, Inc., a Delaware corporation, Fed. Tax Id. #7393.

# I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 363(b), (f) and (m), and 365.

# II.
## BACKGROUND

### Chapter 11 Cases

1.      On September 14, 2007 (the "**Petition Date**"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  The Debtors' chapter 11 cases are being jointly administered.

2.      On August 25, 2009 this Court approved the appointment of Edward N. Cahn, Esquire as Chapter 11 trustee in these cases [Docket No. 900].  No official committee of unsecured creditors has been appointed to date.  The Trustee has been performing his duties and operating the Debtors as authorized by Bankruptcy Code sections 1106 and 1108.

3.      By Order dated October 23, 2009, this Court approved the Trustee's retention of Ocean Park Advisors, LLC ("**OPA**").  Since it retention, OPA has provided financial advisory services to the Trustee, including , without limitation, assisting the Trustee in restructuring the Debtors' business and operations to preserve and maximize value, marketing and sale of certain assets and complying with reporting requirements for a chapter 11 debtor.  At the Trustee's request, OPA has begun the process of marketing the Debtors' business by preparing a due diligence room and marketing materials, identifying potential purchasers and engaging in

2

preliminary discussions with certain interested parties. Immediately upon approval of this Motion, OPA is poised to commence the sale process without delay.

4. On March 5, 2010, this Court entered the *Order (I) Authorizing Debtors' Estates to Obtain Postpetition Financing and to Grant Security Interests and Superpriority Administrative Expense Status and Use cash Collateral Pursuant to 11 U.S.C. §§ 105, 363(c), 364(c), 364(e) and 507(b); (II) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (III) Granting Other Relief* (the "**Financing Order**") authorizing the Debtors' entry into that certain *Secured Super-Priority Credit Agreement among the Bankruptcy Estates of The SCO Group, Inc. and SCO Operations, Inc., by and through Edward. N. Cahn, Solely in His Capacity as Chapter 11 Trustee, as Borrower, and Seung Ni Capital Partners, L.L.C., as Lender, and the Other Lenders from Time to Time Party Thereto* dated as of March 5, 2010 (the "**Credit Agreement**").

*Debtors' Software Business*

5. The Debtors are publicly held Delaware corporations with their corporate headquarters located in Lindon, Utah.

6. The Debtors' core software business focus is to serve the needs of small-to-medium sized businesses and branch offices and franchisees of Fortune 1000 companies, by providing reliable, cost-effective UNIX software technology for distributed, embedded, and network-based systems (the "**Software Business**").

*Utah Litigation*

7. The *SCO v. Novell* litigation was commenced in the District Court for the District of Utah (the "**District Court**") in early 2004 as a slander of title action arising from Novell Inc.'s ("**Novell**") public claims that it, rather than The SCO Group, Inc. ("**SCO Group**"), owns the

133091.01600/40189824v.1

copyrights to technology underlying the UNIX operation system.[2]  Thereafter, Novell asserted counterclaims and SCO Group added new claims against Novell.

8.      Following competing motions for summary judgment, on August 10, 2007, the District Court issued an opinion granting summary judgment that severely limited SCO Group's case against Novell.

9.      SCO Group appealed the District Court's decision to the Tenth Circuit and on August 24, 2009, the Tenth Circuit affirmed in part, reversed in part, and remanded for trial on the remaining issues.  Specifically, the Tenth Circuit reversed the District Court's entry of summary judgment on (1) the ownership of the UNIX and UnixWare copyrights; (2) SCO Group's claim seeking specific performance; (3) the scope of Novell's rights under Section 4.16 of the asset purchase agreement at issue (the "**Novell Santa Cruz APA**"); and (4) the application of the covenant of good faith and fair dealing to Novell's rights under Section 4.16 of the Novell Santa Cruz APA.  The Tenth Circuit remanded the foregoing issues for trial.

10.      Pursuant to the Tenth Circuit's remand, a jury trial was held in the District Court between March 8, 2010 and March 26, 2010.  The sole issue before the jury was the Debtors' claim for slander of title.  The remaining claims were tried to the District Court.

11.      On June 10, 2010, the District Court issued its *Memorandum Decision and Order Denying SCO's Renewed Motion for Judgment as A Matter of Law or, in the Alternative, for A New Trial* (the "**Memorandum Decision**") and its *Findings of Fact and Conclusions of Law* (the "**Findings and Conclusions**").  A true and correct copy of the Memorandum Decision and Findings and Conclusions are attached hereto as Exhibit "2".

---

[2] *The SCO Group, Inc. v. Novell, Inc.*, Case No. 2:04-CV-00139-TS (the "**Utah Litigation**").  The Debtors have filed a notice of appeal an appeal in the Tenth Circuit Court of Appeals (the "**Tenth Circuit**").

12.     By the Memorandum Decision and the Findings and Conclusions, the District Court concluded that because the jury found that the Novell Santa Cruz APA did not transfer the pre-1996 UNIX and UnixWare copyrights from Novell to SCO, there was no need for the jury to reach SCO's slander of title claim.  Importantly, the District Court also held that, among other things, "the [UNIX and UnixWare] copyrights are not required for [the Debtors] to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (Findings and Conclusions, ¶ 80).  Furthermore, the District Court found that "[t]he undisputed evidence is that [the Debtors] did not need the UNIX and UnixWare copyrights in order to operate its UnixWare products business."  (Findings and Conclusions, ¶ 80).  Critically, the District Court found that "Novell sold [the Debtors] the UnixWare business, that is the right to exploit and develop UnixWare."  (Findings and Conclusions, ¶ 130; *see also* Memorandum Decision, ¶ 11).  The Court also found that "it was undisputed that SCO would own any newly developed code and could obtain copyrights to protect that code."  (Findings and Conclusions, ¶ 72).  The District Court further found that "Amendment No. 2 was only meant to confirm that SCO had the rights to use [license] the UNIX technology."  (Findings and Conclusions, ¶ 79).

13.     Accordingly, based upon the District Court's ruling(s), as set forth in the Memorandum Decision and the Findings and Conclusions and above, the Trustee has determined in his business judgment to include within the Acquired Assets, (i) a sale of substantially all of the Debtors' Software Business assets and (ii) as applicable, a sub-license for any copyrights necessary for the Software Business that the Debtors do not own, including the copyrights Novell owns and the Debtors have the right to use (license) as determined by the District Court in the Utah Litigation.

133091.01600/40189824v.1

14.     Before the appointment of the Trustee, the Debtors attempted to sell their assets and were met with objections by Novell, based on, *inter alia*, the uncertainty of the Debtors' rights in the UNIX and UnixWare copyrights in light of the then pending Utah Litigation.  Now that the 10th Circuit, the District Court on remand and the jury have ruled and the Debtors' interest in the Acquired Assets is clarified, the Trustee seeks to sell the Acquired Assets to maximize value for the estates.

### III.
### RELIEF REQUESTED

1.     By this Motion, the Trustee requests the entry of an order (a) authorizing, consistent with the terms of the Form APA, the sale of the Acquired Assets free and clear of all liens, claims and encumbrances, (b) authorizing the assumption, assignment and sale of certain executory contracts and unexpired leases, (c) approving the Bidding Procedures in advance of the proposed Auction, (d) establishing a hearing date for any sale transaction(s) resulting from the Auction and (e) granting related relief as this Court shall deem just, necessary and proper.  In addition, the Trustee requests that this Court's order approving the Bidding Procedures provide that the Trustee may at a later date seek this Court's approval to modify the Bidding Procedures if necessary.[3]

2.     The Trustee has formulated a proposed timeline to effectuate the Transaction(s) (as defined below) contemplated herein, and proposes the following hearings and deadlines, subject to (i) this Court's calendar and (ii) with respect to dates other than the Sale Hearing (as defined below), changes of such dates upon notice to parties in interest but without a further order of this Court:

---

[3] Pursuant to prior Orders of this Court, the Trustee has sold (a) the Mobility Business [Docket. No. 1104], (b) the certain JAVA Patent [Docket. No. 1113], and (c) miscellaneous de minimis assets [Docket. No. 1116].

133091.01600/40189824v.1

| Date | Activity/Deadline |
|------|-------------------|
| August 23, 2010 | • Hearing on Motion to Approve Form APA and Sale Procedures Order[4] |
| October 5, 2010 | • Qualified Bid Deadline |
| October 11, 2010 | • Stalking Horse Identified, if Any |
| October 15, 2010 | • Identify Executory Contracts to be Assumed and Send Cure Notices |
| October 18, 2010 | • Hearing on Stalking Horse Bid Protections in the Event Stalking Horse Named, Subject to Court's Calendar |
| October 25, 2010 | • Objection Deadline with respect to Transactions and Cure Notices |
| November 1, 2010 | • Auction |
| November 3, 2010 | • Sale Hearing, Subject to Court's Calendar |
| On or before November 30, 2010 | • Closing of Transaction(s) |

**A.      The Asset Purchase Agreement.**

3.      The Trustee's professionals have prepared the Form APA to be used for the sale of the Acquired Assets to one or more purchasers (each such sale or licensing a "**Transaction**" and, collectively, the "**Transactions**") at the Auction.  The following are excerpts of certain material terms of the Form APA: [5]

2.1      Sale and Purchase of Acquired Assets.

(a)      Pursuant to the Sale Order, and subject to the terms and conditions of this Agreement, Seller shall sell, transfer, assign and convey to Buyer, free and clear of any and all Encumbrances, and Buyer shall, as of the Closing Date, assume and purchase, free and clear of any and all Encumbrances, all right, title and interest in and to the following assets of Seller relating exclusively to the Business (excluding the Excluded Assets) (the "Acquired Assets"):

(i)      Seller's assets (tangible or intangible) set forth on Schedule 2.1(a) and all Intellectual Property and goodwill related thereto;

---

[4]  The Trustee reserves the right to make a renewed motion to this Court seeking approval of stalking horse bid protections in the event a stalking horse purchaser is named.
[5]  The Summary does not purport to be complete and is subject to, and qualified in its entirety, by reference to the Form APA attached hereto.

(ii)    Seller's Contract Rights under the Assumed Contracts and all end user license agreements between Seller and customers relating to the Acquired Assets, excluding Contract Rights under (A) this Agreement and any other Contracts entered into by Seller with Buyer in connection with the transactions contemplated by this Agreement; and (B) all Contract Rights under any Assumed Contracts requiring a Consent that is not obtained on or before the Closing Date or is not otherwise assigned to Buyer pursuant to the Sale Order ("Non-Assignable Contract(s)"); *provided* that, once such Consent is obtained, the Contract Rights under such Assumed Contract shall be deemed, automatically and without further action by the Parties, to be included in the Acquired Assets as of the date such Consent is delivered to Buyer;

(iii)    Seller's computer media, sales, advertising and marketing materials, catalogues and manuals, billing records, correspondence, data (only to the extent that such data that contains personally identifiable information that may be lawfully transferred), test software, software tools, product documentation, internal documentation, work in progress relating to the software products listed on Schedule 2.1(a), and files relating to the Acquired Assets (only to the extent that any such materials or files exist), excluding (A) Seller's minute books, membership interest books and related organizational documents and (B) Seller's files, books and records relating to the Excluded Assets or to Seller's Obligations not included in the Assumed Obligations;

(iv)    All licenses, permits, approvals, qualifications, consents and other authorizations of any Governmental Body necessary for the lawful ownership and operation of the Acquired Assets to the extent the Seller possesses such licenses, permits, approvals, qualifications, consents and other authorizations and the same are transferable and may be assumed and assigned or such transfer is approved by the Sale Order);

(v)    All rights and claims of Seller against any third parties, directly arising from or directly related to the Acquired Assets (which, for the avoidance of doubt, shall not include any rights and claims of Seller against any third parties, directly arising from or directly related to the Excluded Assets); and

(vi)    All rights and interests of Seller in each of the Purchased Subsidiaries.

(c)    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.1(a) or elsewhere in this Agreement, the Assets of Seller set forth in Schedule 2.1(c) (collectively, the "Excluded Assets") are not part of the transactions contemplated hereunder, are

excluded from the Acquired Assets and shall remain the property of Seller after the Closing.

*The schedule of Excluded Assets lists the following*:

(i)     all rights of Seller under this Agreement and all agreements contemplated hereby;

(ii)     all of Seller's rights and obligations with respect to the SVRX Licenses (as defined in the Santa Cruz-Novell APA);

(iii)     SCO Japan, Ltd., a Japanese corporation, and SCO Canada Company, a Canadian corporation;

(iv)     (a) cash and cash equivalents and marketable securities (including cash in transit and cash and marketable securities in lock boxes or on deposit with or otherwise held by any financial institution); (b) accounts receivable (including accounts receivable for services rendered through the Closing Date with respect to which invoices are mailed after the Closing Date) and other trade receivables; and (c) all prepaid premiums and other prepayments and deposits with respect to the Company's Employee Benefit Plans (if any), the Company's insurance policies, and any other Contracts not purchased by Buyer;

(v)     all rights of Seller in the Licensed Properties; and

(vi)     all of Seller's claims, causes of action and other legal or equitable rights and remedies (A) against Buyer with respect to the transactions contemplated by this Agreement and (B) relating to all rights and interests in all litigation claims pending or that may be asserted in the future, against International Business Machines Corporation, Novell, Inc., SUSE Linux GmbH or others, and (C) relating to every claim of any nature whatsoever, known or unknown that has been or may be asserted against RedHat, Inc. or others relating to or arising from all licensing, covenant not to sue rights, releases or other claims relating to any allegations that Linux violates SCO's Unix or UnixWare intellectual property, contract or other rights.

2.2     Grant of License.     Pursuant to the License Agreement described in Section 7.2 of this Agreement, Seller shall grant to Buyer a perpetual, non-exclusive, royalty-free license to use the Licensed Properties[6] as provided in the License Agreement.

3.     Purchase Price.     This Motion contemplates a marketing process and as such, the purchase price is still to be determined.

---

[6] "Licensed Properties" means all copyrights and other Intellectual Property used by the Debtors in the Software Business as currently conducted that the Debtors do not own, including the copyrights owned by Novell, as determined in the Memorandum Decision and Findings and Conclusions.

4.10    Disclaimer.  **THIS IS AN "AS IS, WHERE IS" SALE**.

6.3    List of Designated Executory Contracts.  Not fewer than seven (7) Business Days prior to the Sale Hearing, Buyer shall deliver to Seller a final list of the Designated Executory Contracts to be acquired by Buyer in connection with the Closing, pending approval of such list by the Bankruptcy Court.

7.1    Closing.  The closing of the sale of the Acquired Assets and assumption by Buyer of the Assumed Obligations (the "Closing") shall take place on November 30, 2010 (the "Closing Date"), subject to extension upon agreement of Seller and Buyer.

*The Closing is conditioned upon the payment of the Purchase Price, the entry of the Sale Order and the execution and delivery of the following documents:*

7.2    Closing Deliverables and Conditions of Seller.  The obligations of Buyer under this Agreement are subject to the following conditions being met or waived by Seller and the delivery by Seller at the Closing of each of the following (any one or more of which may be waived in whole or in part by Buyer at its sole option and which conditions are set out herein for the exclusive benefit of Buyer):

(a)    Intellectual Property Assignments.  Assignments of Acquired Assets constituting Intellectual Property in the form attached to the Form APA as Exhibit "A" (the "Intellectual Property Assignments");

(c)    Lease Assignment.

(d)    Assignment and Assumption Agreement.    An assignment and assumption agreement, in the form attached to the Form APA as Exhibit "B" (the "Assumption Agreement"); and

(e)    License Agreement.  A license agreement for the Licensed Properties, in the form attached to the Form APA as Exhibit "C" (the "License Agreement").

7.3(c)    Cure of Defaults.  At or prior to the Closing, Buyer shall have cured, or made arrangements to cure promptly, any and all defaults under the Designated Executory Contracts that are required to be cured under the Bankruptcy Code, so that such Designated Executory Contracts may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code

9.1    Termination.  This Agreement may be terminated without liability of either Party to the other Party in any of the following ways:

(a)     by the mutual written consent of Buyer and Seller at any time on or prior to the Closing Date;

(b)     by Buyer or Seller if the Bankruptcy Court has not entered the order approving the sale (the" Sale Order") by the Closing that:

(i)     approves the sale of all of the Acquired Assets to Buyer and the assumption and assignment of all Assumed Contracts free and clear of all Encumbrances pursuant to Sections 363(b) and 363(f) of the United States Bankruptcy Code; and

(ii)     contains findings of fact and rulings that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the United States Bankruptcy Code.

(c)     by Buyer or Seller if the Closing has not occurred by November 30, 2010, or such later date as may be determined by mutual written consent of Seller and Buyer.

**A.     <u>The Assumption, Assignment, and Sale of Assigned Contracts.</u>**

4.     Pursuant to Bankruptcy Code section 365, the Debtors will assign to a purchaser, and the purchaser will assume from the Debtors, the assigned contracts as set forth in the Form APA (the "**Assigned Contracts**").  The cure amounts, if any, as determined by the Bankruptcy Court, necessary to allow assumption and assignment of the Assigned Contracts under Bankruptcy Code section 365 will be paid by the applicable purchaser (or the purchaser shall have delivered into escrow on terms reasonably acceptable to the Trustee such amounts sufficient to pay any cure claim that is disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts) and the Debtors' estates shall have no liability for any such cure amount.  The cure amounts to be paid by any purchaser pursuant to an executed asset purchase agreement are hereinafter sometimes referred to as the "**Cure Amounts**."

133091.01600/40189824v.1

5. On or before October 15, 2010, the Potential Purchaser will file and serve a notice of proposed Cure Amounts (the "**Cure Notice**") on the non-Debtor parties to such Assigned Contracts (the "**Contract Parties**"). Thereafter, the Trustee proposes that the deadline for the Contract Parties to object to the Trustee's proposed Cure Amounts as listed in the Cure Notice(s) should be set on that date which is ten (10) days after the filing of such Cure Notice. Any objection to the Cure Amounts which is timely filed and served by any Contract Parties in accordance with the Cure Notice, and which is not otherwise resolved by the parties, shall be heard by this Court at the Sale Hearing (as defined below).

6. Pursuant to the Form APA, the applicable purchaser shall be responsible for satisfying the Cure Amounts as described above or otherwise set by final order of this Court. The applicable purchaser shall further be responsible for providing adequate assurance of future performance pursuant to Bankruptcy Code section 365(b) in connection with the proposed assumption and assignment of any Assigned Contract.

## A. Bidding Procedures.

7. The Trustee proposes that this Court approve the following specific bidding procedures (the "**Bidding Procedures**"):

    a. **Potential Bidder.** Parties interested in participating in the bidding process (a "**Potential Bidder**") will be required to deliver to the Trustee (to the extent not already delivered) the following:

        i. An executed confidentiality agreement in form and substance acceptable to the Trustee; and

        ii. The most current audited (if available) and the latest unaudited financial statements as well as financial information evidencing the Potential Bidder's ability to close the transaction that meets with the Trustee's satisfaction.

        As promptly as practicable after a Potential Bidder delivers the above information, the Potential Bidder shall be eligible to commence due diligence with respect to the assets as defined in the

133091.01600/40189824v.1

Form APA.  The Trustee reserves the right to refuse any Potential Bidder access to the due diligence materials if such access is deemed to be harmful to the Debtors' estates.

b.  **Deadline for Submission of Bids.**  The deadline for submitting any and all competing bids shall be on or before **October 5, 2010, at 5:00 p.m. (Prevailing Delaware Time)** (the "**Bid Deadline**").

c.  **Submission of Bids.**  In order to qualify as a potential Qualified Bidder (as defined below) of any Acquired Assets, a Potential Bidder must timely submit a written bid (a "**Qualified Bid**") for a portion or all of the Acquired Assets that:

   i.  Contains an executed asset purchase agreement in substantially the same form as set forth in Exhibit "1" hereto, with all modifications thereto (the "**Modified APA**"), wherein the Potential Bidder proposes:

      1.  Which of the Acquired Assets the Potential Bidder seeks to acquire; and

      2.  Which of the Debtors' executory contracts and unexpired leases such bidder seeks to assume and the proposed terms of cure.

   ii.  The Modified APA shall be accompanied by a blacklined copy of the Form APA showing all changes made to the Form APA.

   iii.  The Modified APA shall not contain:

      1.  A request for any type of expense reimbursement or similar type of payment; or

      2.  Any due diligence, financing contingencies, or other contingency of any kind.

   iv.  Evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA.

   v.  Information regarding such Potential Bidder's financial capability to consummate the transactions contemplated by the Modified APA containing such financial and other information that will allow the Trustee to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, including, without limitation:

133091.01600/40189824v.1

1. The most current audited (if available) and latest unaudited financial statements (the "**Financial Information**") of such Potential Bidder; or

2. If the Potential Bidder is an entity formed for the purpose of acquiring Acquired Assets then:

   A. The Financial Information of the equity holder(s) of the Potential Bidder or such other form of financial disclosure acceptable to the Trustee; and

   B. The written commitment of such equity holder(s) to be responsible for the Potential Bidder's obligations in connection with the acquisition of Acquired Assets.

vi. Discloses fully the identity of each entity that will be bidding for Acquired Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation.

vii. Discloses fully the terms of the proposed employment of any of Debtors' employees, management, or officers in connection with such bid.

viii. Is accompanied by a cash deposit in an amount equal to 10% of the total purchase price set forth in the Modified APA (the "**Deposit**").

ix. Is delivered such that it is received by the close of business on the Bid Deadline by the following: (1) Bonnie Glantz Fatell, Esq., Blank Rome LLP, 1201 N. Market Street, Suite 800, Wilmington, DE 19801; and (2) Bruce Comer and Mark Fisler, Ocean Park Advisors LLP, 6033 West Century Boulevard, Suite 1290, Los Angeles, CA 90045 (collectively, the "**Notice Parties**").

d. **Qualification of Bid.** After a Potential Bidder has delivered a bid, the Trustee will determine whether such Potential Bidder is a "**Qualified Bidder**" and such bid is a "**Qualified Bid**." Promptly after making such determination, the Trustee will advise such bidder of this determination. The Trustee reserves the right to reject any bid.

e. **Auction.** The Trustee will conduct an auction to determine the highest or best bid for the Acquired Assets beginning at **10:00 a.m. (Prevailing Delaware Time) on November 1, 2010, at the law offices of Blank Rome LLP located at 1201 N. Market Street, Suite 800, Wilmington, DE 19801**. The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear at the Auction. Each Qualified Bid other than the opening bid is referred to as a "**Subsequent Bid**." At the conclusion of the Auction, or as soon

14

thereafter as practicable, the Trustee shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the process, including those factors affecting the speed and certainty of consummating the Transactions; (ii) identify the highest or otherwise best offer(s) for each Acquired Asset received at the Auction (the "**Highest Bid**", and the bidder(s) making such bid, the "**Stalking Horse**"); and (iii) designate any Back-Up Bidders (as defined below).

f.     **Auction Procedures.**  The Auction will be conducted as follows:

i.     Only the Trustee, the Debtors, any secured lender of any Debtor, and any Qualified Bidder who has timely submitted a Qualified Bid (and the legal and financial advisers to each of the foregoing) may attend the Auction, and only Qualified Bidders may make any subsequent Qualified Bids at the Auction.

ii.     At least one (1) business day prior to the Auction, each Qualified Bidder who has submitted timely a Qualified Bid must inform the Trustee whether it intends to participate in the Auction. Failure to comply with this provision may preclude an otherwise Qualified Bidder from attending and/or participating in the Auction. As soon as is practicable before the Auction, the Trustee must provide copies of the Qualified Bid the Trustee believes is the highest or otherwise best offer to all Qualified Bidders who are eligible to attend and participate in the Auction.

iii.     All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bids will be fully disclosed to all other bidders throughout the entire Auction.

iv.     All Qualified Bidders attending the Auction shall agree to remain ready, willing, and able to close a Transaction with respect to specific Acquired Assets under the terms of their last Qualified Bid submitted at such Auction as the back-up bidder (the "**Back-Up Bidder**" and such last bid, the "**Back-Up Bid**") until the earlier of (1) the close of the Transaction with respect to the specific Acquired Assets, or (2) December 15, 2010, and shall close if the Stalking Horse fails to close, if, as, and when determined by the Trustee to be the new Highest Bid.

v.     The Trustee may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not

inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order entered in connection herewith.

vi.    Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid. The bidding shall be in minimum increments to be set by the Trustee at the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.

vii.    The credit bid rights of any secured party shall be preserved in accordance with Bankruptcy Code section 363(k).

g.    **Sale Hearing.** The Trustee requests that this Court schedule the Sale Hearing to approve the Transactions on **November 3, 2010, at 3:00 p.m. (Prevailing Delaware Time)**. All objections to any Transaction shall be filed with the Bankruptcy Court and served on the Notice Parties on or before **October 27, 2010 at 5:00 p.m. (Prevailing Delaware Time)**. The Stalking Horse and any Back-Up Bidder(s) must produce a competent witness at the Sale Hearing (and any subsequent hearing) to provide testimony, if necessary, to establish adequate assurance of future performance by each such bidder under the unexpired leases and executory contracts to be assigned to such bidder, to the extent required by Bankruptcy Code sections 365(b). At the Sale Hearing, the Trustee will request that this Court approve each Transaction with regard to the Back-Up Bidder in the event the contemplated Transaction with the Stalking Horse does not timely close; in which case such Back-Up Bidder shall become the Highest Bid without further order of this Court.

h.    **Closing.** Any closing of a Transaction shall take place on or before **November 30, 2010**, except upon the waiver of this requirement by the Trustee.

i.    **Return of Deposits.** The Deposits of all Qualified Bidders shall be held in an interest-bearing escrow account. Notwithstanding the foregoing, the Deposit submitted by the Stalking Horse, together with interest accrued thereon, shall be applied against the payment of the Purchase Price upon closing of the Transaction with the Stalking Horse. Except as otherwise provided in a Modified APA and herein, all Deposits (together with interest accrued thereon) shall be returned to each Qualified Bidder not selected by the Trustee as either the Stalking Horse or the Back-Up Bidder within five (5) business days of the adjournment of the Auction. The Deposit of the Back-Up Bidder, to the extent not designated as the Highest Bid, shall be returned to the Back-Up Bidder within five (5) business days following the date of closing the Transaction.

8. To ensure that all parties-in-interest receive adequate notice of the Auction, not later than two (2) days after the entry of the Sale Procedures Order, substantially in the form attached to this Motion as Exhibit "3," the Trustee will serve a copy of such order, which approves the Bidding Procedures and schedules the Auction and Sale Hearing, via first-class United States mail, postage prepaid to (a) the Office of the United States Trustee for the District of Delaware, (b) all entities known to have expressed a *bona fide* interest in acquiring any of the Acquired Assets within the last several months, (c) federal, state, and local regulatory authorities (including taxing authorities) with jurisdiction over the Debtors, and (d) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers). The Trustee also will publish the Sale Procedures Order in the Salt Lake City, UT newspaper. The Trustee submits that all parties-in-interest will have adequate notice of the Auction and the proposed Transactions.

## IV.
## BASIS FOR RELIEF REQUESTED

1. The Trustee has determined that a disposition of the Debtors' operating assets is necessary to maximize available value for all parties-in-interest in these cases. The Trustee asserts that the proposed Transactions are in the best interests of the Debtors' estates and their creditors and hereby requests that this Court approve the relief requested herein.

133091.01600/40189824v.1

**A.** **Disposition of the Acquired Assets is Authorized Under Section 363(b) of the Bankruptcy Code.**

2.     Bankruptcy Code section 363(b)(1) provides that a trustee, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he [C]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

3.     Disposition of the Acquired Assets should be authorized pursuant to Bankruptcy Code section 363(b) if a sound business justification exists for doing so.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) *(citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (N.D. Ga. 1985) ("[A] debtor seeking approval for [a sale under section 363(b)] bears the burden of articulating a sound business justification . . ."); *In re Tom's Foods, Inc.*, 2005 WL 3022022 at *2 (Bankr. M.D. Ga. 2005) ("It is now generally accepted that section 363 allows such sales in chapter 11, provided, however that the sale proponent demonstrates a good, sound business justification for conducting the sale . . ."); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).  The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the assets; and whether the asset is decreasing or increasing in value.

124 B.R. at 176. The court in *In re Tom's Foods* further held that, in addition to demonstrating a sound business justification, the sale proponent also must show "that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable." 2005 WL 3022022 at *2.

4. The Trustee has proposed to sell the Acquired Assets after thorough consideration of all viable alternatives, and has concluded that such disposition is supported by a number of sound business reasons. Hence, re Trustee has determined that a disposition of the Acquired Assets pursuant to the terms of the Form APA provides the best and most efficient means for the Trustee to maximize the value of the Debtors' estates.

5. Based on the foregoing, the disposition of the Acquired Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, pursuant to Bankruptcy Code section 363(b), the Trustee requests approval of the sale of the Acquired Assets to the Stalking Horse as set forth herein.

A. **Sale of the Acquired Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Bankruptcy Code Section 363(f).**

6. Bankruptcy Code section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in a bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

7.      As quoted above, Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interest." The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." *Id.*, at 258. The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* (citing 3 Collier on Bankruptcy 363.06[1]).

8.      As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of Bankruptcy Code section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under section 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

9.      Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Acquired Assets to one or more purchasers free and clear of all interests. *See In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002) ("Since the five conditions listed in 11 U.S.C. § 363(f)

are phrased in the disjunctive, property may be sold free and clear of interests if any one of the five conditions is satisfied."). *See also Citicom Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

10.     The Trustee submits that any "interest" in the Debtors' assets will be satisfied by at least one of the five conditions in Bankruptcy Code section 363(f), and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Trustee accordingly requests authority to convey the Acquired Assets to a purchaser free and clear of all interests.

11.     The Trustee has conducted a UCC search to determine possible lienholders of the Acquired Assets in conjunction with the proposed sale of the Acquired Assets.[7] The Trustee has served such purported lienholders notice of this Motion, and will serve such parties with notice of any order approving the relief requested by this Motion.

12.     Accordingly, this Court should approve the sale of the Acquired Assets to the Stalking Horse, free and clear of interests under Bankruptcy Code section 363(f).

## A.     The Bidding Procedures Provided Herein Are Consistent and Appropriate in the Context of Bankruptcy Transactions.

13.     Courts have made clear that a trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R, 650, 656-57 (Bankr. S.D.N.Y. 1992). The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In*

---

[7] Nothing herein shall be deemed an admission of validity, extent, priority or perfection.

*re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 (same); *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same).

14.    In that regard, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); *Integrated Resources*, 147 B.R. at 659; *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) ("Competitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize the bidding, not to restrict it'").

15.    The Bidding Procedures proposed herein will provide a framework for the Trustee to entertain Qualified Bids for the Acquired Assets and, if the Trustee receives such Qualified Bids, to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a Transaction.  This should increase the likelihood that the Debtors' estates will receive the greatest possible consideration for the Acquired Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Trustee's desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any deterioration in value.

133091.01600/40189824v.1

### A. This Court Should Approve the Assumption, Assignment, and Sale of the Assigned Contracts.

16.     As required by the APA, the Trustee requests approval of the ability to assume, assign, and sell the Assigned Contracts to a purchaser.

17.     The Assigned Contracts are those contracts or leases that the Trustee seeks approval to assume and assign to a purchaser as part of a Transaction under an executed Modified APA.  The Trustee further requests that the order approving a Transaction provide that the Assigned Contracts will be assigned to, and remain in full force and effect for the benefit of, the applicable purchaser, notwithstanding any provisions in the Assigned Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3), that prohibit such assignment.

18.     Bankruptcy Code section 365(f)(2) provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> A.     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> B.     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

19.     Under section 365(a), a trustee "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

> A. cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;
>
> B. compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> C. provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

20.     Although Bankruptcy Code section 365 does not set forth standards for courts to apply in determining whether to approve a trustee's decision to assume an executory contract, it is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the trustee. *See In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'I Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989); *In re Gardinier, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption would benefit the estate or the rejection would allow the trustee to avoid burdensome obligations previously incurred by the debtor. *In re Diamond Mfg. Co., Inc.*, 164 B.R. 189, 198 (Bankr. S.D. Ga. 1994). *See also Sharon Steel*, 872 F.2d at 40.

21.     The assumption, assignment, and sale of the Assigned Contracts is an integral part of the disposition of the Acquired Assets and, as stated above, such disposition provides the maximum available benefit to the Debtors' estates. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Contract Party to the applicable contract or lease. The payment of the Cure Amounts will be in full and final satisfaction of all obligations to cure defaults and compensate the Contract Parties for any pecuniary losses under such contracts or leases pursuant to Bankruptcy Code section 365(b)(1).

133091.01600/40189824v.1

22.     Cure Amounts properly disputed by any contracting party to an Assigned Contract will be resolved by this Court at the Sale Hearing.

23.     As set forth in this Motion, each purchaser is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contract.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365 depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re DH4, Inc.*, 2007 WL 3283781 at *4 (Bankr. S.D. Fla. 2007) ("What constitutes 'adequate assurance of future performance' must be determined by the facts of the proposed assumption"); *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. 111. 1985).  To the extent necessary, each purchaser shall provide evidence of its ability to provide adequate assurance to the contracting parties to the Assigned Contracts at the Sale Hearing.

24.     No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

### V.
### NOTICE

1.     Notice of this Motion has been provided to:  (a) the Office of the United States Trustee; (b) counsel for the lenders under the Credit Agreement; (c) any party filing a request for notice pursuant to Bankruptcy Rule 2002, and (d) all persons known to the Trustee who have expressed an interest in the assets of the Software Business.  In addition, an advertisement of this

133091.01600/40189824v.1

Motion will be placed in the local Salt Lake City, UT newspapers.  In light of the nature of the relief requested herein, the Trustee submits that no other or further notice is necessary or required.

WHEREFORE, the Trustee respectfully requests that this Court enter an order (a) approving the sale of the Acquired Assets, whether individually or as part of one or more packages, to one or more purchasers at an auction free and clear of all liens, claims, encumbrances, and other interests pursuant Bankruptcy Code sections 105(a), 363(b), (f), and (m), (b) authorizing the assumption, assignment, and sale of the Assigned Contracts pursuant to Bankruptcy Code sections 363 and 365, (c) approving the Bidding Procedures in advance of the proposed Auction, (d) setting a date on or before November 3, 2010 as the Sale Hearing and (e) granting related relief as this Court shall deem just, proper and necessary.

Dated:  August 9, 2010
      Wilmington, Delaware

Respectfully submitted,

**BLANK ROME LLP**

/s/ Bonnie Glantz Fatell
Bonnie Glantz Fatell (No. 3809)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

*Counsel for Edward N. Cahn, Chapter 11 Trustee*

133091.01600/40189824v.1