# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| The SCO Group, Inc., et al., ) | |
| ) | Case No. 07-11337 (KG) |
| Debtors. ) | (Jointly Administered) |

**Objection Deadline: February 7, 2011 at 4:00 p.m. (prevailing Eastern time)**
**Hearing: February 16, 2011 at 4:00 p.m. (prevailing Eastern time)**

## OBJECTION OF NOVELL, INC. TO SALE

Novell, Inc. ("Novell"), objects to the proposed sale by chapter 11 trustee Edward M. Cahn (the "Trustee") of certain of the assets of debtors The SCO Group, Inc. ("SCO") and SCO Operations, Inc. ("SCOO" and, together with SCO, the "Debtors") pursuant to the Asset Purchase Agreement (dated January 19, 2011) (the "unXis APA") between the Debtors and unXis, Inc. ("unXis").[1]

The unXis APA is yet the latest installment in a series of attempts by the Debtors to sell assets without necessary consents from Novell for the assumption and assignment of agreements with Novell. As before, Novell will not consent. Moreover, even if they could sell the assets without Novell's consent, the Debtors will have to make a cure payment that is beyond their means, even with the addition of the purchase price of $600,000. Finally, the Debtors have failed to provide adequate assurance of future performance by unXis as the proposed assignee.

Though the current transaction differs slightly from those in the past, Novell's fundamental objections are the same as before, as elucidated by Novell in, e.g., its Objection of Novell, Inc., to Assumption and Assignment and Cure Amounts (Dkt. no. 1141) (the "Recent Objection") and Novell's Response to Debtors' Notice of Cure Amounts (Dkt. no. 858) (the

---

[1] The unXis APA is attached as Exhibit A to the Notice of Filing of (I) Executed Asset Purchase Agreement and (II) Proposed Sale Order in Connection Therewith (Dkt. No. 1212).

sf-2953725

"Earlier Objection"). The unXis APA suffers from the very same infirmities as those earlier transactions. Moreover, the economics of each deal the Debtors have put before this Court in the three-plus years since they filed these cases have grown inexorably worse, as have their finances, which are now beyond desperate. As Novell will demonstrate, this deal makes no economic sense given its minimal proceeds, as contrasted with the Debtors' cost to cure defaults under the Novell agreements it must assume and assign if it is to close the unXis APA.

It should be clear by now, therefore, that the estates cannot engage in any material transaction without Novell's consent, and they should not spend any more time or money on pursuing transactions without getting that consent.

## I. BACKGROUND

1. The Court has been feted with the background of this situation numerous times. Still, it will be useful for Novell to reiterate certain information essential to this objection.

### A. The Essence of the Original APA and the unXis APA

2. In 1995, Novell sold certain assets to the Debtors' predecessor, Santa Cruz, pursuant to an Asset Purchase Agreement (the "Original APA"). Recital A of the Original APA states that:

> Seller is engaged in the business of developing a line of software products currently known as Unix and UnixWare, the sale of primary binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business").

(Findings of Fact and Conclusions of Law (Case No. 2:04-CV-139 TS (the "District Court Action"), United States District Court, District of Utah (the "District Court") (the "F&C") 6 ¶ 14.)[2]

3. In 2004, litigation broke out between Novell and the Debtors, which had since bought the Novell assets from Santa Cruz (from now on, Novell will refer only to the Debtors in

---
[2] A copy of the F&C is attached hereto as Exhibit A.

connection with the Original APA as though they were the original counterparty). Among the central issues was whether Novell transferred its underlying UNIX software copyrights in the Original APA. The Debtors claimed that it had, and Novell asserted that it had not, but that it had instead merely licensed the copyrights to the Debtors in order to permit them to develop, modify, and distribute UnixWare. (*See* F&C 1-2.) One of the arguments the Debtors made in support of their position was that they had to *own* the copyrights to conduct their business. (*See, e.g.,* F&C 16 ¶ 36, 27 ¶¶ 62-63.)-Ultimately, both the jury and the District Court in the ligation sided with Novell, rejecting the contention that the Debtors had acquired the Unix copyrights. (F&C 32-33 ¶¶79-80.; Memorandum Decision [etc.] (District Court Action Dkt. No. 877 (the "Memorandum") 6-7.)[3] Instead, the license to the copyrights that Novell granted in the Original APA was held to be sufficient.

   4. The Debtors now seek to convey virtually all of the Original APA assets to unXis. As the unXis APA's recitals announce:

> A. Seller provides UNIX® system software products and related services (together with the business and operations of Seller relating thereto and the goodwill appurtenant to such business and assets, and the furnishing of services in connection therewith, the "<u>Business</u>").
>
> B. Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, substantially all of the Acquired Assets (defined below) of Seller related to the Business, and Buyer desires to assume certain Obligations (defined below) of Seller related to the Business, all on the terms and subject to the conditions set forth in this Agreement.

(unXis APA 1.) It follows by the Debtors' own admission that to operate the Business as defined the unXis APA, unXis (or any other buyer) needs access to the copyrighted material that the Debtors licensed from Novell. In other words, any buyer of the Business must have the Debtors assume and assign their Novell copyright licenses.

---

[3] A true and correct copy of the Memorandum is attached hereto as Exhibit B and incorporated herein by reference.

5. As Novell explains below, what these facts mean is that the Debtors cannot close the unXis APA unless it assumes and assigns the Original APA and related agreements. But they cannot do that without Novell's consent, which Novell does not give, without curing at least $3 million in defaulted debt to Novell, and without providing adequate assurance of future performance by unXis, which the Trustee has not done.

### B. The Structure and Essential Terms of the Original APA

6. In the Original APA, Novell reserved certain important rights to itself. For example, as noted above, it retained all copyrights. There are other provisions imposing continuing obligations of the parties to each other that arise in or from the Original APA. As noted above, Novell licensed the copyrights to the Debtors. Other examples include the provisions of Original APA Section 4.18 (obligation of SCO to develop the "Business" Novell sold to it). Under Amendment 2 to the Original APA, as confirmed by the Tenth Circuit's decision in the appeal of the District Court Action, SCO also has ongoing obligations to Novell relating to its dealings with SVRX Licenses. (*See generally The SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1208, 1227 (10th Cir. 2010); F&C.)

7. In addition, the Original APA provided for and gave rise to certain other agreements between Novell and SCO (together with the Original APA, the "Original APA Agreements"). Pursuant to Original APA Section 1.6, there is a Technology License Agreement (the "TLA") between the parties in which the Debtors licensed certain rights to Novell. (*See, e.g.,* F&C 13-14 ¶ 29.)

8. In addition, although the transferred assets included legal title to (but not Novell's equitable interest in) SVRX software licenses (the "SVRX Licenses"), which generated a royalty stream for Novell (the "SVRX Royalties"), Novell similarly reserved and augmented important rights for itself regarding the SVRX Licenses and SVRX Royalties. Specifically, for purposes of this proceeding:

- SCO has *only "legal title and not an equitable interest in the SVRX Licenses [R]oyalties* within the meaning of

> Section 541(d) of the Bankruptcy Code." (Original
> APA § 1.2(b).)

- "All right, title and interest to the SVRx [sic] Royalties, less . . .[a] 5% fee for administering the collection thereof pursuant to Section 4.16 hereof" are *excluded* from the transfer. (Original APA, Schedule 1.1(b)(VIII).)

- "Within 45 days of the end of each fiscal quarter of [SCO], [SCO] shall deliver to [Novell] or [Novell's] assignee 100% of any SVRX Royalties collected in the immediately preceding quarter." (Original APA § 4.16(a).)

- SCO is required "*to [re]assign [to Novell at Novell's sole pleasure]* any rights to . . . any SVRX License to the extent so directed in any manner or respect by" Novell. (Original APA § 4.16(b).)

- SCO cannot "amend, modify or waive any right under or assign any SVRX License *without the prior written consent of [Novell].*" (Original APA § 4.16(b).)

- SCO must provide Novell detailed monthly reports and submit to audits. (Original APA §§ 1.2(b).)

- SCO must collect and remit all royalties per Section 4.16. (Original APA § 1.2.)

(Emphasis added.)

9. Finally, and of the utmost importance, Original APA Section 9.5(c) expressly prohibits its assignment by SCO without Novell's consent.

10. Novell has also obtained an award in the District Court Action against SCO of $3,506,526 (including pre- and post-judgment interest) for the Debtors' breaches of the Original APA, plus costs of $187,817.95 and accruing interest.[4] Of that sum, $625,486.90 plus accrued interest thereon was paid last Spring as funds held in trust for Novell (*see* Agreed Order Approving Stipulation [etc.] (Dkt. No. 1126), but the balance of about over $3 million (plus accruing interest and perhaps additional costs due to the Debtors' further appeal) remains unpaid.

---

[4] *See* Final Judgment (District Court Action Dkt. No. 878), attached hereto as Exhibit C and incorporated herein by reference; Taxation of Costs (District Court Action Dkt. No. 894), attached hereto as Exhibit D and incorporated herein by reference. *See also The SCO Group, Inc. v. Novell, Inc.*, 578 F.3d at 1227; Proof of Claim No. 146, as amended March 27, 2009.

## II. APPLICABLE LAW GENERALLY

11. Novell's objections to the unXis APA also require a brief summary of applicable principles of law regarding the assumption and assignment of executory agreements. The Trustee must take each contract as he finds it, with *all* of its burdens along with its benefits. He thus may only assume a contract in whole; he cannot pick and choose which provisions or benefits or burdens he wishes to assume and assign and which he wishes to shed. *In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007); *Cinicola v. Scharffenberger*, 248 F.3d 110, 11-20 (3rd Cir. 2001). The assumption and assignment of a contract is "'intended to change only *who* performs and obligation, not the obligation to be performed itself.'" *Id.* (citation omitted) (emphasis added).

12. By the same token, the Trustee must assume or assign all of a series of integrated and related contracts even if they appear in separate documents. *In re Exide Techs.*, 340 B.R. 222, 229 (Bankr. D. Del. 2006), *affirmed* 607 F.3d 957 (3d Cir. 2010). In *Exide Techs.*, the Court found that the following agreements were part of an integrated transaction and that the debtor had to assume or reject them as a batch rather than individually:

> In 1991, [debtor] Exide entered into a series of agreements with EnerSys for the sale of substantially all of Exide's industrial battery division. The parties executed over twenty-three agreements as part of the transaction. The following four agreements are at the heart of this dispute: (1) the Trademark and Trade Name License Agreement, dated June 10, 1991 ("Trademark License"), (2) the Asset Purchase Agreement, dated June 10, 1991, (3) the Administrative Services Agreement, dated June 10, 1991, and (4) a letter agreement, dated December 27, 1994 (collectively, all four are referred to herein as the "Agreement") . . . .
>
> As part of the transaction, EnerSys paid in excess of $ 135 million at closing. In exchange for such payment, EnerSys received various assets, including manufacturing plants, equipment and certain intellectual property rights. Certain Exide employees in the industrial battery division became EnerSys employees.

*Ibid*, 340 B.R. at 227-28.

13. In addition, the right to assume or reject an executory contract is subject to certain limitations. One, found in section 365(c) of the Code, sets forth exceptions to the general right to assume executory contracts in the first instance. It provides, in relevant part:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment;

11 U.S.C. § 365(c).

14. Accordingly, under section 365(c) of the Code, the Trustee may not assume or assign an executory contract without consent if "applicable law" provides that the non-debtor does not consent. In the Third Circuit, based on the so-called "hypothetical" test governing the interplay between Code sections 365(c) and 365(f), *see Cinicola*, 248 F.3d at 126 n.19; *In re West Elecs., Inc.*, 852 F.3d 79, 83 (3d Cir. 1988), the Trustee may not assume, let alone assign, licenses of copyrights from the copyright holder without the former's consent. *Cinicola,* 248 F.3d at 121; *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 265-70 (4th Cir. 2004).

### III. THE DEBTORS MUST ASSUME AND ASSIGN *ALL* THE ORIGINAL APA AGREEMENTS

15. As explained above, unXis will need the copyright licenses to be able to operate the Business that it is buying. But the Debtors will have to assume and assign to unXis more than just the licenses.[5] Based upon *Exide Technologies*, it is clear that the copyright licenses are part of an integrated transaction that includes *all* of the Original APA Agreements. Consequently, the Trustee must assume all of the Original APA Agreements (not just the licenses or even just the Original APA) or can assume and assign none of them. *Exide Technologies.*; *Fleming Cos.*

---

[5] Without those licenses, unXis will be risking an infringement suit by Novell.

Here the Trustee does not appear to be trying to assume all of the Original APA Agreements, starting, but not ending, with the Original APA itself. For that reason alone, Trustee cannot convey the Business-critical copyright licenses to unXis. Moreover, as Novell will explain below, there are additional reasons why the Trustee cannot assume any of the Original APA Agreements (as he must do if he is to assume any).

## IV. THE NOVELL AGREEMENTS CANNOT BE ASSUMED AND ASSIGNED WITHOUT NOVELL'S CONSENT

16. The copyright licenses in (or provided for by) the Original APA are part of the integrated transaction of which the Original APA is the linchpin. The Original APA itself both contains copyright licenses and is part of an integrated agreement (comprising the Original APA Agreements) that encompasses other, albeit separately-documented, copyright licenses. (The SVRX Licenses are also copyright licenses, although it appears that the Trustee does not intend to assume and assign them.) Consequently, the Trustee cannot assume any of these copyright licenses (or copyright license-embedding agreements such as the Original APA) without Novell's consent. *Sunterra Corp.* Novell declines to consent.

17. This means that the Trustee cannot assume the Original APA or any copyright license in it or that is part of the integrated agreement comprising the Original APA Agreements. Hence, the Trustee also cannot assume *any* of those agreements since under *Exide Technologies* he must assume them all to assume any of them.

## V. THE DEBTORS MUST PAY THE FULL AMOUNT OF THE NOVELL JUDGMENT AND COSTS IN ORDER TO ASSUME THE ORIGINAL APA

18. In addition to getting Novell's consent, to assume and assign the Original APA itself the Trustee will have to pay a cure amount of over $3 million pursuant to Novell's judgment and awarded costs pursuant to Code section 365(b)(1).[6] It does not appear that the estates have that much unencumbered cash in them, or that much cash of any kind for that matter, even with the

---

[6] Novell believes these costs are also expenses of administration under Code section 503. *See, e.g., Irmas Family Trust v. Madden (In re Madden)*, 185 B.R. 815 (BAP 9th Cir. 1995).

addition of the purchase price of $600,000.[7]  This is another reason why Novell contends that the Court must disapprove the unXis APA.  And even if there were enough cash to pay this cure amount, it is questionable whether paying $3 million to get $600,000 (plus some speculative warrants) is an acceptable exercise of the Trustee's business judgment.

### VI. THE TRUSTEE HAS NOT PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE

19. The Trustee has presented no evidence regarding what unXis is, what its resources are, or who its personnel are.  Hence, he has thus far supplied no evidence of unXis's ability to provide Novell with the adequate assurance of future performance of the terms and conditions of the Novell Agreements (and, indeed, of the larger family of Original APA Agreements) to which Novell is entitled under Code section 365(f)(2)(B).  *See generally Cinicola*, 248 F.3d at 120 n.10 (discussing adequate assurance for both assumption and assignment).  The Debtors have the burden of proof on this issue.  *Ill Inv. Tr. V. Allied Waste Inds., Inc. (In re Resource Tech. Corp.)*, 624 F.3d 376, 384 (7th Cir. 2010); *HEA Mgt. Group, Inc. v. Health Enters. Of Michigan, Inc. (In re Texas Health Enters., Inc.)*, 246 B.R. 832, 835 (Bankr. N.D. Tex. 2000).

20. Indeed, what evidence there is offers little comfort to Novell.  We know that this Court questioned unXis's good faith in the failed proposed transaction that the Earlier Objection addressed.  (*See* Memorandum Opinion (Dkt. No. 890) 9 ("Further, the Court is unable to find based on this record, the Debtors' history of unsuccessful sale efforts and this sale's peculiar and questionable timing that Unxis has acted in good faith.").)  And we also know that an entity associated with unXis's signatory on the unXis APA., Stephen Norris, was involved in one of the Debtors' earlier abortive attempts to push through an ill-advised sale.  (*Ibid* 6.)  Finally, we know that Mr. Norris of unXis was party to a somewhat unusual loan transaction involving Darl McBride while Mr. McBride was still managing the Debtors and Mr. Norris was still in the hunt

---

[7] The Balance Sheet in the October 2011 Monthly Operating Report ("MOR") of SCOO (the main vessel of assets for the Debtors) shows $707,489 in unrestricted cash, $186,987 in restricted cash and $679,145 in net receivables. It also shows a owners' equity of a negative $7.875 million, a figure that would be even worse were about $1.2 million in receivables from insolvent SCO and an inexplicable $2 million in goodwill subtracted from the asset side. (Dkt. No. 1214.)

for a deal with the Debtors. (*See* Transcript of July 27, 2009 proceedings (Dkt. No. 892) 259:1-23.)

## VII. CONCLUSION

The simple fact is that the Debtors, Trustee and unXis require Novell's consent to the unXis APA. Based on the Earlier Objection and the Recent Objection, this is no surprise. Rather, this newest foray by the Trustee and Debtors into a sale of the Debtors' assets is nothing less than a stubborn refusal to face facts that will go on until the estates have completely depleted the little they have left (and perhaps even after that in the misguided hope of pulling a rabbit out of the hat).

And as Novell has explained, there are other obstacles to the transaction even were its consent not needed. For example, as noted above, the cure cost alone to assume the Original APA outstrips the estate's assets and is, in any case, a bad economic deal in return for $600,000 and warrants of speculative value. Nor will the economics improve. The purchase prices the Debtors have negotiated have gone down steadily over the years since they filed these cases, and their assets have declined just as steadily. This will only get worse.

In sum, there is no reason for the Trustee to pursue any further any transaction necessarily involving the Original APA, as does the unXis APA, without first getting Novell's consent to it. The parties should not have to come back to Court on yet another contested sale.

Dated: February 7, 2011
Wilmington, Delaware

                YOUNG CONAWAY STARGATT & TAYLOR, LLP

                */s/ Sean T. Greecher*
                James L. Patton (No. 2202)
                Michael R. Nestor (No. 3526)
                Sean T. Greecher (No. 4484)
                The Brandywine Building
                1000 West Street, 17th Floor
                P.O. Box 391
                Wilmington, Delaware 19899-0391
                Telephone (302) 571-6600

                -- and --

                MORRISON & FOERSTER LLP
                Adam A. Lewis
                425 Market Street
                San Francisco, California 94105-2482
                Telephone (415) 268-7000

                -- and --

                MORRISON & FOERSTER LLP
                Larren M. Nashelsky
                1290 Avenue of the Americas
                New York, New York 10104-0050
                Telephone (212) 468-8000

                Counsel for Novell, Inc.