**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| TSG GROUP, INC., *et al.* | Case No. 07-11337 (BLS) |
| Debtors. | **Hearing Date: 9/22/21 at 1:00 p.m. (ET)**<br>**Objections Due: 9/9/21 at 4:00 p.m. (ET)** |

**OBJECTION OF XINUOS, INC., TO THE MOTION OF CHAPTER 7 TRUSTEE FOR ENTRY OF AN ORDER APPROVING THE SETTLEMENT AND RELEASE AGREEMENT BY AND BETWEEN THE TRUSTEE AND INTERNATIONAL BUSINESS MACHINES CORPORATION**

Xinuos, Inc., ("Xinuos") files this Objection to the Motion of Chapter 7 Trustee Pursuant to Fed. R. Bankr. P. 9019 for Entry of an Order Approving the Settlement and Release Agreement by and Between the Trustee and International Business Machines Corporation. *See* D.I. 1501 (the "Motion"). In support of this Objection, Xinuos respectfully represents as follows:

**PRELIMINARY STATEMENT**

The Trustee is attempting to settle significant claims by TSG Group, Inc. ("TSG"), formerly known as The SCO Group, Inc. ("SCO") against International Business Machines Corp. ("IBM") in a manner that risks prejudicing Xinuos' rights. The pending claims in TSG's lawsuit against IBM are the only remaining assets held by the estate of TSG and TSG Operations, Inc. (collectively, the "Debtors").[1] This is because Xinuos (f/k/a UnXis, Inc.) acquired the entirety of the SCO business, including the UnixWare and OpenServer products, and certain copyright assets from the bankruptcy estate in 2011. *See* Declaration of Sean Snyder, Xinuos' CEO ("Snyder

---

[1] When describing historical events, including the negotiation of the Asset Purchase Agreement with Xinuos, Xinuos refers to "SCO." Because Xinuos acquired SCO's entire business, including the SCO-brand, out of this bankruptcy proceeding, except for the "Excluded Assets" (discussed herein), the counterparty to the Asset Purchase Agreement, the Debtors in this proceeding, and the plaintiff in the pending IBM-related litigation were renamed and are now referred to as "TSG."

Decl.") ¶ 21.   A decade later, Xinuos has now brought a federal lawsuit against IBM for infringement of the acquired copyrights and for injury caused by IBM's and Red Hat's violations of the federal antitrust and local competition laws.  That lawsuit is currently pending.

Given the breadth of the releases in the proposed Settlement and Release Agreement (the "Proposed Settlement Agreement") between the Trustee and IBM, Xinuos is concerned that the Trustee is improperly attempting to extend releases that would purport to encompass Xinuos' claims against IBM and Red Hat.  This Objection is directed at ensuring that the Trustee is not purporting to release or settle the foregoing claims, held solely by Xinuos, and seeks a judicial declaration that the Proposed Settlement Agreement does not and cannot release such claims as a matter of law.

The Proposed Settlement Agreement states in section 3.1 that the Trustee releases IBM from "any and all claims," including "causes of action and other legal or equitable rights and remedies relating to (1) all rights and interests in all litigation claims pending or that may be asserted in the future against IBM and Red Hat, and (2) any allegations that Linux violates SCO's Unix or Unixware intellectual property, contract or other rights."  D.I. 1501-2 at 10.

Xinuos objects to this language to the extent that it purports to release IBM or Red Hat from Xinuos' claims.  The language is broad enough to improperly suggest that it releases claims that the Debtors do not own or otherwise have a right to sue on.  Specifically, the language could improperly suggest the release of two categories of claims held solely by Xinuos, some of which were acquired through the January 19, 2011 Asset Purchase Agreement by and between The SCO Group, Inc., SCO Operations, Inc., and UnXis, Inc. (the "Asset Purchase Agreement" or "APA").  *See* D.I. 1216-1:

- First, section 3.1 contains language that could improperly suggest release of litigation claims pending or that may be asserted in the future against IBM relating to copyrights that the Trustee sold to Xinuos through the Asset

Purchase Agreement (the "<u>Post-1995 Copyright Claims</u>")

- Second, section 3.1 contains language that could improperly suggest release of litigation claims pending or that may be asserted in the future by Xinuos against IBM or Red Hat relating to unfair and anticompetitive business practices by IBM and Red Hat that cause injury to Xinuos (the "<u>Competition Claims</u>")

Xinuos has notified the Trustee that it opposes any attempts to undermine Xinuos' rights to pursue these claims. *See* Declaration of Gabriel M. Ramsey ("<u>Ramsey Decl.</u>") ¶ 3. Moreover, both the Trustee and IBM know that Xinuos has filed a suit in the District Court for the U.S. Virgin Islands against IBM and Red Hat, and that this suit raises the Post-1995 Copyright Claims and Competition Claims. *See id*. ¶ 4. *See also Xinuos, Inc. v. International Business Machines Corporation, et al.*, Case No. 3:21-cv-00031 (D.V.I.) (the "<u>Virgin Islands Litigation</u>").

Despite all of this, the Trustee and IBM have presented a Proposed Settlement Agreement with language that could be read to improperly purport to usurp Xinuos' rights. It is not difficult to understand why they have done this. The Trustee wants to close this decade-long bankruptcy action and IBM wants to prevent Xinuos from bringing its claims in the Virgin Islands Litigation.

But as a matter of contract and as a matter of law, Xinuos is the only party that can assert or resolve the Post-1995 Copyright Claims involving the copyrights that were acquired by Xinuos and Xinuos is the only party that can assert or resolve the Competition Claims involving competitive injury to Xinuos after it was formed and acquired the SCO business and products.

For these reasons, and the reasons stated below, Xinuos respectfully requests that the Motion be denied and that the Court declare that any proposed settlement between the Debtors and IBM cannot encompass these claims or otherwise impair Xinuos' rights.

## **BACKGROUND FACTS**

### I.    **The UNIX Operating System**

1.    In the 1970's, AT&T developed the computer operating system known as UNIX. *See* Snyder Decl. ¶ 4. UNIX was (and remains) highly valuable to large enterprise customers due

to its reliability and scalability.  *Id*.

2.      Many software distribution vendors entered into licensing agreements with AT&T to use UNIX in their own proprietary operating systems.  *Id*. ¶ 5.  For example, IBM licensed UNIX from AT&T and then wrote further UNIX code for its AIX operating system.  *Id*.  Though AT&T owned UNIX, IBM owned the new UNIX source code that it developed on top of it.

3.      In or around 1993, AT&T sold all right, title, and interest in UNIX to Novell, Inc. ("Novell").  *Id*. ¶ 6.  This sale included all right, title, and interest in any UNIX licensing agreements.  *Id*.  Novell developed a UNIX operating system product known as UnixWare.  *Id*.

4.      On or about September 19, 1995, SCO entered into an asset purchase agreement with Novell, acquiring UNIX and UnixWare products, source code, and business (the "Novell Agreement").  *Id*. ¶ 7.  SCO believed that it also obtained the copyrights that Novell purchased from AT&T and which Novell otherwise created prior to the date of the Novell Agreement.  *Id*.

5.      After September 19, 1995, SCO continuously wrote or had written new source code adding improvements and functionality to the UnixWare product.  *Id*. ¶ 15.  SCO's "Post-1995" developments were incorporated into the company's proprietary UnixWare products.  *Id*.  At all points prior to and after the Novell Agreement, SCO had also separately developed its own proprietary OpenServer operating system product, also based on UNIX, but which was not impacted by the Novell Agreement in any way.  Due in large part to SCO's high-quality operating system products, including the Post-1995 developments to the UnixWare source code, these products were highly valuable and made SCO very successful.  *Id*.

6.      Some of SCO's Post-1995 improvements occurred in connection with a joint initiative between SCO and IBM known as "Project Monterey."  *Id*. ¶ 16. For example, and without limitation, SCO developed "cross-architecture" functionality in connection with Project Monterey.  *Id*.  The cross-architecture functionality makes it much easier for enterprise users to transition

software applications from 32-bit environments to higher-powered 64-bit environments.  *Id*.

7.      Project Monterey began in October 1998.  *Id*.  However, IBM withdrew from Project Monterey in 2001 before the work was completed.  *Id*.

**II.     The Utah Litigation – Pre-Novell Litigation Resolution**

8.      In 2003, SCO sued IBM.  *See SCO Grp. v. Int'l Bus. Machines Corp.*, Case No. 2:03-cv-00294 (D. Utah) (the "Utah Litigation").  Three groups of allegations from the operative complaint (the Second Amended Complaint) are relevant for present purposes:

9.      First, SCO alleged that IBM breached UNIX licenses that it owned.  *See* Utah Litigation, D.I. 108 (Second Amended Complaint) ¶¶ 110-172.  SCO argued at this time that it had purchased all right, title, and interest in UNIX from Novell, including all right, title, and interest in any UNIX licenses.  SCO alleged that IBM had improperly and secretly used the pre-September 19, 1995 UNIX code in an open source operating system called Linux, and therefore had breached the UNIX licenses that IBM had entered into with AT&T.

10.     Second, SCO alleged that IBM infringed UNIX copyrights which it believed that it had acquired from Novell, namely the copyrights in the pre-September 19, 1995 code obtained from Novell.  *Id*. ¶¶ 173-180.  This copyright infringement theory was based on the exact same facts as the license breach theory.  *See e.g. id.* ¶ 179 ("IBM's breaches of the [AT&T UNIX licenses] and its post-termination actions have infringed, have induced infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors").

11.     Third, SCO alleged that IBM unfairly competed with SCO by misrepresenting its intentions to SCO regarding Project Monterey and through infringement of the pre-September 19, 1995 code, engaging in a course of conduct designed to destroy SCO's ability to commercialize the UNIX products and business that it acquired from Novell.  *Id*. ¶¶ 53-57, 181-188.  SCO argued here that IBM coaxed and persuaded SCO to enter Project Monterey without any actual intention

to complete the work, and solely to stall SCO's own operating system development efforts, to harm SCO's ability to further the UNIX products and business acquired from Novell, to harm SCO's products that were doing much better in the market than IBM's products, and to secretly benefit the Linux operating system ecosystem generally.  *Id.*

### III.    The Novell Litigation

12.    While the Utah Litigation was still underway, in 2004, SCO initiated a separate suit against Novell.  *See SCO Group v. Novell, Inc.*, Case No. 2:04-cv-00139 (D. Utah) (the "Novell Litigation").  For SCO, the object of this suit was to establish, by judicial decree, that, through the Novell Agreement, it received all right, title, and interest in all of the UNIX and UnixWare code and copyrights that had been developed prior to September 19, 1995 by Novell or AT&T.  *See* Novell Litigation, D.I. 96 (Second Amended Complaint) ¶¶ 89-95.

13.    After six years of litigation, it turns out that SCO was mistaken about whether the copyrights in the pre-September 19, 1995 UNIX and UnixWare code was actually conveyed to SCO.  In March 2010, after a two-week trial, the jury returned a verdict that SCO did not obtain any ownership interest in the pre-September 19, 1995 UNIX and UnixWare copyrights through the Novell Agreement, and instead only obtained a license to use UNIX and develop its own proprietary UNIX-based technology going forward.  *See* Novell Litigation, D.I. 877 (Denying Motion for Judgment as a Matter of law); 878 (Final Judgment).

14.    But this did not mean SCO owned no assets.  Indeed, the Court in the Novell Litigation expressly noted after the trial that "it was undisputed that SCO would own any newly developed code and could obtain copyrights to protect that code."  D.I. 877 at 7.

15.    In other words, the Court in the Novell Litigation recognized in 2010 that SCO owned the Post-1995 code developments in UnixWare and associated copyrights, despite the otherwise negative result for SCO.

IV.     **The Utah Litigation – Post-Novell Litigation Resolution**

16.     The outcome in the Novell Litigation substantially impacted the Utah Litigation. Once final judgment in the Novell Litigation was entered, the Court in the Utah Litigation held that "SCO is bound by, and may not here re-litigate, the rulings in the *Novell* Judgment that Novell (not SCO) owns the copyrights to the pre-1996 UNIX source code, and that Novell waived SCO's contract claims against IBM for alleged breaches of the licensing agreements pursuant to which IBM licensed such source code."  Utah Litigation, D.I. 1132 at 2.

17.     SCO admitted the same about the Novell Litigation's impact on the Utah Litigation. On June 24, 2013, it stated that its "copyright infringement claim against IBM . . .  is foreclosed and may be dismissed on the basis of the <u>Novell</u> judgment that Novell owns the copyrights to pre-1996 UNIX source code."  *See id*. D.I. 1119 at 3.  Notably, in the same filing, SCO lists "[c]laims unaffected by the Novell Judgment," and the list does not mention a copyright or contract breach claim, or any part of such claim.  *Id*.

18.     And IBM also agreed that the scope of the copyright infringement claim in the Utah Litigation was exactly the same as the scope of the copyright ownership question in the Novell Litigation – i.e., covering only the code at issue under the Novell Agreement from prior to September 19, 1995 (the date of the Novell Agreement).  Earlier on in the Utah Litigation, IBM moved to make clear that its counterclaim for a declaration of non-infringement only covered the UNIX code that was at issue in the Novell Agreement and not any additional code.  *See id*. D.I. 405 (IBM's Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim, stating that "[i]n asserting its Ninth Counterclaim, IBM intended to seek only a declaration that because IBM has not breached IBM's license agreements with AT&T and SCO's purported termination of those licenses is invalid, IBM's continued distribution of AIX . . . does not infringe SCO's alleged copyrights").  The District Court affirmed this ruling.  *See id*. D.I. 471 (Order Limiting Scope of

IBM's Ninth Counterclaim "to seeking a declaration that IBM has not infringed SCO's alleged copyrights based on alleged breaches of license agreements with AT&T and SCO's purported termination of these licenses.").

19.     In other words, because – based on the outcome in the Novell Litigation – SCO did not own the copyrights in the UNIX and UnixWare code acquired from Novell, or the accompanying UNIX licenses, SCO lacked a basis to bring a contract breach claim or a copyright infringement claim.  The Court in the Utah Litigation, SCO, and IBM all recognized this.  The copyrights at issue in the Novell Litigation were co-extensive with the copyrights at issue in the Utah Litigation, so the dispositive outcome against SCO in the Novell Litigation left nothing left to litigate in the Utah Litigation concerning the contract breach and copyright infringement claims. Those two sets of allegations (i.e., groups 1 and 2 from ¶¶ 9 and 10 above) were completely gone.

20.     But group three – the allegation that IBM misled SCO and unfairly impeded the value of the UNIX business that SCO acquired from Novell by contributing the pre-September 19, 1995 code to Linux – survived.  After several more years of litigation and a summary judgment ruling from the District Court in favor of IBM, the Tenth Circuit held that this unfair competition cause of action survived.  *See SCO Group, Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1075-81 (10th Cir. 2018).  The District Court was thus reversed on this basis.  *Id*. at 1086.

21.     Thus, all that remains now in the Utah Litigation is a trial on the unfair competition claim.  The Utah Litigation is the dispute that the Proposed Settlement Agreement would settle.

## V.     Ancillary Actions Involving Red Hat And SUSE

22.     In 2003, contemporaneously with the Utah Litigation, Red Hat filed a lawsuit against SCO, seeking a declaration that Red Hat's Linux products had not violated the pre-September 19, 1995 copyrights at issue in the Utah Litigation.  *See Red Hat, Inc. v. The SCO Group, Inc.*, Case No. 1:03-cv-00772 (D. Del.).  In 2004, this Court stayed this case pending

resolution of Utah Litigation. *Id.*, D.I. 34. The Red Hat case was closed in 2007 pending resolution of SCO's bankruptcy petition. *Id.*, D.I. 72.

23.     In 2006, Novell's SUSE division filed a request for arbitration with the Secretariat of the International Chamber of Commerce's International Court of Arbitration in Paris, France. *See* ICC Case No. 14320/FM, Styled *SUSE Linux GmbH (Germany) v. The SCO Group, Inc. (USA)*. This arbitration was in response to SCO's allegation in the Novell Litigation that Novell's SUSE Linux products violated the pre-September 19, 1995 copyrights at issue in both the Novell Litigation and the Utah Litigation. *See* Novell Litigation, D.I. 139 (describing substance of the arbitration). The arbitration sought a declaration that SUSE's Linux products had not violated those copyrights. *Id.* In 2007, this Court issued an order enforcing the automatic stay of the SUSE arbitration pending resolution of SCO's bankruptcy petition. *See* D.I. 204.

## VI.     The Present Bankruptcy Action – Introduction

24.     While both the Utah Litigation and Novell Litigation were still underway, SCO filed for Chapter 11 bankruptcy. *See* D.I. 1. Edward N. Cahn was appointed as the Chapter 11 Trustee by the United States Trustee on August 25, 2009, and this Court approved the appointment on the same day. D.I. 898, 899, 900. Upon conversion of these cases to cases under Chapter 7, Mr. Cahn was appointed as Chapter 7 Trustee and remains in that position. *See* D.I. 1439, 1443.

25.     SCO apparently thought that, if there were favorable outcomes in the Novell Litigation and then the Utah Litigation, SCO could again become solvent and operational on the same terms as before filing for Chapter 11 bankruptcy. *See e.g.*, D.I. 1249 (Hearing to Approve the Asset Purchase Agreement) (where counsel for the Trustee stated that "[t]he Trustee and his professionals were aware that the outcome of a jury trial would have a material effect on the valuation of the debtors' software business assets."); *see also* Snyder Decl. ¶ 18.

26.     However, after the jury verdict in the Novell Litigation, counsel for the Trustee

stated to this Court that an asset purchase sale was "really the next logical step for these estates."

D.I. 1164, 6:14-15 (Hearing on Request to Auction Office Substantially All of SCO's Assets).

27.     A process took place to identify the best offer.  *See* D.I. 1249, 17:5-18:21 (Counsel

for Trustee describing the bid process).  Xinuos was chosen as the buyer of SCO's business assets.

**VII.    The Present Bankruptcy Action – The Asset Purchase Agreement**

28.     The meeting of the minds between the Trustee and Xinuos on the scope and effect

of the asset sale was memorialized in the Asset Purchase Agreement.  *See* D.I. 1216-1.  For present

purposes, the APA has four material parts.

29.     **First, it defines the "Acquired Assets" sold from SCO to Xinuos in section 2.1**

**and makes clear that "Acquired Assets" include all Post-1995 copyrights and the entire**

**business, products, and operations of SCO, the right to all royalties and revenue from those**

**assets, and the right to all claims arising from those assets**.  *See id.*, § 2.1.  In relevant part, the

Asset Purchase Agreement states that Xinuos:

> shall, as of the Closing Date, acquire and purchase, free and clear of any and all
> Encumbrances and Retained Obligations, all of Seller's right, title, and interest in
> and to any and all of the assets of the Business[2], except for the Excluded Assets set
> forth in Schedule 2.1(c) hereof (the "Acquired Assets"), including but not limited
> to, the following:
>
> (i) All of Seller's assets (tangible or intangible), including those assets set forth on
> Schedule 2.1(a), all Intellectual Property[3], including all copyrights developed after
> 1995 . . .
>
> (vi) All rights and claims of Seller against any third parties, directly arising from or
> directly relating to the Acquired Assets (which, for the avoidance of doubt, shall

---

[2] The APA defines Business follows: "Seller provides UNIX® system software products and
related services (together with the business and operations of Seller relating thereto and the
goodwill appurtenant to such business and assets, and the furnishing of services in connection
therewith, the "Business")."  D.I. 1216-1, § A (recitals).

[3] The APA defines Intellectual Property to include "all . . . registered and unregistered . . .
copyrights . . . proprietary information, technology, original works of authorship (including
computer software) and similar rights to any of the foregoing around the world, all applications
for any of the foregoing, and the right to prosecute, enforce, obtain damages relating to, settle or
release any past, present, or future infringement thereof."  D.I. 1216-1, § 1.34.

not include any rights and claims of Seller against any third parties, directly arising from or directly related to the Excluded Assets, any rights and claims by Seller against Buyer relating to this Agreement or any agreement entered into pursuant hereto, or any rights, claims or causes of action related to Novell, Inc., International Business Machines Corporation, Red Hat, Inc. and SUSE Linux GmbH or other similar claims).

*Id*. § 2.1(a)(i), (vi).

30.     The Acquired Assets unambiguously include all of the Post-1995 proprietary developments that SCO made to the UNIX operating system technology and any other intellectual property created by SCO.  This includes numerous releases of the UnixWare and OpenServer products, and all Post-1995 code developments whether embodied in a released product or not, and all registered and unregistered copyrights and exclusive rights associated with the foregoing.  *See* D.I. 1216-1, § 2.1 and Schedule 2.1(a) (pages 57-63 of the docket entry).  The parties further executed a separate Intellectual Property Rights Assignment formally assigning all such exclusive rights under the Copyright Act to Xinuos.  *See* Snyder Decl., ¶ 23.  Xinuos also acquired the sole right to receive royalties and licensing fees flowing from those exclusive rights under the Copyright Act.  D.I. 1216-1, § 1.34 (assigning to Xinuos sole and exclusive rights to "prosecute, enforce, obtain damages relating to, settle or release any past, present, or future infringement" of the Post-1995 copyrights, as part of the assigned intellectual property).

31.     The parties understood this language to mean that (1) Xinuos was purchasing all of the Acquired Assets but none of the Excluded Assets; (2) the Acquired Assets include all of SCO's intellectual property, which expressly encompasses "all copyrights developed after 1995" and the sole and exclusive right to receive royalties and licensing fees from those copyrights; (3) the Acquired Assets include any legal or equitable claims "against any third parties, directly arising from or directly relating to the Acquired Assets"; and (4) these claims do not include "for the avoidance of doubt" certain claims of SCO against third parties and Xinuos, and certain claims

against Novell, IBM, Red Hat, Inc., and SUSE (herein, the "Avoidance of Doubt" provision).  *See*

Snyder Decl. ¶ 29.

32.     **Second, the APA identifies what are the "Excluded Assets" in Schedule 2.1(c),**
**which are limited to SCO's operative claims against IBM and others, and do not include**
**claims to assert the post-September 19, 1995 copyrights or claims that accrued to Xinuos**
**after the transaction**.  *See id*., Schedule 2.1(c).  For present purposes, only sub-provisions (viii)

and (ix) matter.  Sub-provision (viii) states that the Excluded Assets include "all rights of Seller in

the Licensed Properties" (discussed more fully below).  *Id*.  Sub-provision (ix) states that the

Excluded Assets include the following:

> all of Seller's claims, causes of action and other legal or equitable rights and
> remedies (A) against Buyer with respect to the transactions contemplated by this
> Agreement and (B) relating to all rights and interests in all litigation claims pending
> or that may be asserted in the future, against International Business Machines
> Corporation, Novell, Inc., SUSE Linux GmbH or others, and (C) relating to every
> claim of any nature whatsoever, known or unknown that has been or may be
> asserted against RedHat, Inc. or others relating to or arising from all licensing,
> covenant not to sue rights, releases or other claims relating to any allegations that
> Linux violates SCO's Unix or UnixWare intellectual property, contract or other
> rights;

*Id*.  The parties understood this sub-provision to protect SCO's ability to seek vindication for any

breach of the APA by Xinuos in part (A), to permit SCO to continue to litigate the operative

complaints in the Utah Litigation, the Novell Litigation and the ancillary Red Hat and SUSE

actions in part (B), and to permit SCO to pursue any claims that Linux violates SCO's intellectual

property, contract or other rights in part (C).  *See* Snyder Decl. ¶ 28.

33.     The parties also understood that the Avoidance of Doubt provision was framed as

"*for avoidance of doubt*" (as opposed to as a wholly separate and distinct section of the APA)

intentionally to reflect the foregoing Excluded Assets.  *See id*. ¶ 29.

34.     The Avoidance of Doubt provision is only meant to clarify what the legal and

equitable claims that Xinuos purchased do not encompass based on preexisting understandings

about the asset sale and the provisions in the APA governing the Excluded Assets. *See id*.  The term must be interpreted in that manner.[4]  *See Rexam Inc. v. Berry Plastics Corp.*, 2015 Del. Ch. LEXIS 297, at *7 (Del. Ch. Dec. 3, 2015) ("[A]s a matter of law" the Court must "select the interpretation that better comports with the remaining contents of the document or gives effect to all the words in dispute.") (quotation omitted)  For example, consistent with the Excluded Assets definition, the Avoidance of Doubt provision clarifies that the claims Xinuos purchased do not encompass any claims that SCO has against third-parties related to the Excluded Assets or the particular claims of SCO against Novell, IBM, Red Hat, and SUSE, all involving the pre-September 19, 1995 copyrights, which SCO was in the process of litigating against such parties at that very time in the Utah Litigation, the Novell Litigation and the Red Hat and SUSE actions.

35.    The background against which these terms were negotiated was that the jury verdict and judgment had been entered in the Novell Litigation, but SCO had not exhausted its appeal of the issue of whether SCO had acquired the pre-September 19, 1995 copyrights from Novell.  *See* Snyder Decl. ¶¶ 24-25.  Indeed, the APA was entered into as of January 19, 2011 and the Court of Appeals did not finally conclude that Novell owned that material until August 30, 2011.  *See SCO Group, Inc. v. Novell, Inc.*, 439 F. App'x 688, 691 (10th Cir. 2011).  In other words, the entire purpose and meaning of these provisions was that SCO would retain the right to pursue its claims regarding the pre-September 19, 1995 code and copyrights should it be successful on appeal and retained those claims and rights as "Excluded Assets."  *See* Snyder Decl. ¶¶ 24-32.

36.    Importantly, the Excluded Assets do not include any of the Post-1995 copyrights, any exclusive right under the Copyright Act in such copyrights or any exclusive right to receive royalties or licensing fees under any such constituent rights under the Copyright Act.  *See* Schedule

---

[4] The APA states that the agreement is made under and shall be construed and enforced in accordance with the laws of the State of Delaware.  *See* D.I. 1216-1, § 10.3.

2.1(c).  This is consistent with the fact that, at the same time and through the same legal instrument, SCO transferred the post-September 19, 1995 code and copyrights to Xinuos, as the "Acquired Assets," and all rights to assert those copyrights.  The parties understood this, and this was Xinuos' and the Trustee's intent in framing the agreement in this way.  *See* Snyder Decl. ¶¶ 24-32.

37.     **Third, the APA establishes, in section 2.2, a sublicense by SCO to Xinuos to use the pre-September 19, 1995 copyrighted code owned by Novell and a mere non-exclusive license back from Xinuos to SCO to "use" the post-September 19, 1995 copyrighted code that was transferred to Xinuos.**  D.I. 1216-1, § 2.2.  The first part of section 2.2 states that SCO grants Xinuos "a perpetual, non-exclusive, royalty-free sublicense to use the Licensed Properties." *Id*.  The Licensed Properties are defined in § 1.40 to explicitly refer to the UNIX code that SCO mistakenly thought it owned but that—as a result of the jury verdict in the Novell Litigation—it turns out SCO only had a license to use.  *Id*., § 1.40.[5]  Accordingly, while SCO had no entitlement or ability to sell these Novell assets to Xinuos, SCO did have the right to sublicense the Novell assets to Xinuos.  The sublicense was necessary because Xinuos needed access to the legacy UNIX code to ensure that the proprietary post-1995 developments that it did acquire could function properly and it needed the right to distribute products based on such code to carry out the business.

38.     The second part of section 2.2 states that Xinuos grants SCO "a perpetual, non-exclusive, royalty-free license to **use** the Intellectual Property transferred under this Agreement solely in connection with the exercise of its rights and performance of its obligations with respect to the Excluded Assets."  *Id*., § 2.2 (emphasis added).  Accordingly, this license granted SCO a

---

[5] Section 1.40 states: "'<u>Licensed Properties</u>' means all copyrights and other Intellectual Property used by Seller in the Business as currently conducted that Seller does not own, including the copyrights owned by Novell, Inc., as determined in the Memorandum Decision and Order Denying SCO's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial and by the Findings of Fact and Conclusions of Law of the United States District Court of Utah on June 10, 2010."

"non-exclusive . . . license to use" the Post-1995 developments that it had just assigned to Xinuos "solely in connection with" its rights regarding the Excluded Assets.  *Id*.  In other words, while Xinuos was willing to permit SCO to "use" the post-September 19, 1995 copyrighted code in the context of the Utah Litigation, Novell Litigation and ancillary Red Hat and SUSE actions—for example, as evidence in those cases of SCO's market success—no further rights were extended by Xinuos.  *Id*.[6]  While the parties clearly knew how to use the word "sublicense" (indeed they had used that term in the previous sentence), nowhere did Xinuos grant back to SCO the right to "sublicense" or otherwise "license" the post-September 19, 1995 copyrights or code to any other party, IBM or otherwise.  *Id*.  Thus, the Debtors were not granted and do not possess any right to license or sublicense the post-September 19, 1995 copyrights or code.

39.    **Fourth, the APA includes a severability clause** that states "[i]f any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions hereof shall not be affected thereby and shall be enforceable without regard thereto." *Id*., § 10.9.

## VIII.  The Present Bankruptcy Action – The Hearing On The Asset Purchase Agreement

40.    On March 2, 2011, this Court held a hearing on whether to approve the Asset Purchase Agreement.  *See* D.I. 1249.  A few statements from that hearing are worth highlighting.

41.    First, during the cross-examination of Bruce Comer, the scope of the asset sale was made clear:[7]

> Q.  Now, I'm just curious.  Well, let me ask you this question a little bit differently.
> On a kind of general level, you're intimately familiar with the transaction, right?
> A.  Yes.
> Q.  Okay, what's the debtor going to be left with, in general, once this transaction

---

[6] Notably, a vestigial footnote to the Xinuos-to-SCO License indicates that SCO's purpose was to support maintenance of the pending claims: "Seller [i.e., SCO] to confirm with litigation counsel that license-back of copyright is sufficient to maintain litigation." D.I. 1216, § 2.2, n. 1.

[7] Bruce Comer was the founder and managing director of Ocean Park Advisors, LLC, which was retained by the Trustee as a financial advisor.  *See* D.I. 1249, 19:6-13.  Counsel for the Trustee stated that Mr. Comer was "familiar with debtors' day-to-day operations, business and financial affairs."  *Id*., 19:14-15.

is done?

A.   We're going to be le – the purchase price, the 600,000 dollars, the accounts receivable, which will be collected by the buyer.  That value, as of today, is about 680,000 dollars, actually.  The cash balance in the company after the cure amounts – the net amounts of the cure are paid, and so that's the – that's what will be left over.

Q.  Any intellectual property?

A.  No.  That's going to the buyer.

Q.  Any employees?

A.  No, because the buyer's taking all the employees.

Q.  So, in essence, the debtors will be out of business when this transactions closes, except for the purposes of winding up their estates?

A.  That is correct.  The operating software business, that is correct.  There will be no operating assets left.

*Id*. 34:5-25.  In other words, for purposes of the operating system business, the intent of the APA was to place Xinuos completely and wholly in SCO's shoes.  For SCO, after the APA "there will be no operating assets left."  *Id*., 34:24-25.

42.     Second, during the direct examination of William Broderick by counsel for the Trustee, the urgency of the APA and a sale was explained:[8]

Q.  OK, if SCO is unable to transfer these assets to [Xinuos], what impact will there be on its customers?

A.  If SCO goes out of business, the impact is going to be pretty disastrous worldwide.  This is an operating system that's used worldwide.  We're not selling a lot of product right now, but we have a lot of support relationships in place.  The people – the installed base that's using UNIX needs us to support them.  The distributors that distribute our product do a lot of support of their customers, but we have support agreements, we support those distributors.  If those distributors can no longer support their customers, then all those people I described before, small, medium, large corporations, retail outlets, government agencies, they're up a creek for support.  If something happens to their operating system, they've got nobody to turn to.

*Id*., 65:13-25.

43.     Thus, Mr. Broderick made clear that unless the entire business, products, assets, and associated intellectual property and rights were transferred to Xinuos, there would be a

---

[8] William Broderick was a SCO contractor who had been an employee at AT&T since 1991, working on UNIX, and was an employee working on UNIX at Novell as well.  *See id*., 54:6-56:18.

deleterious impact on a substantial ecosystem of customers and partners and their operations. Indeed, the intent of the parties to the agreement was consistent with this position – that after the APA, Xinuos would take over all SCO operations and for all intents and purposes stand in the shoes of SCO for worldwide business activities. *See* Snyder Decl. ¶ 27. Thus, Xinuos was acquiring all rights, including intellectual property rights and rights to pursue its own commercial interests, sufficient to protect and defend that server operating system ecosystem and the entirety of the business that it was acquiring. *See id*.

44.    And third, during the redirect examination of Mr. Comer by counsel for the Trustee, the relationship between the Acquired Assets and Excluded Assets was placed into sharper focus:

> Q. There was a question about whether the debtor would be left with any assets, and you very specifically said there would be no operating assets. You are familiar with the litigation that's been going on with Novell, correct?
> A. That's correct.
> Q. And that's on appeal right now?
> A. Um-hum.
> Q. So the debtor continues to have some interest in that litigation?
> A. Absolutely. And there may be some holding companies and other assets, but the operations – I guess what I was referring to was the customer-facing operations and assets will go to the buyer.
> Q. Okay, and are you aware –
> A. The litigation claims – or, the claims were all – were one of the excluded assets in the transaction.

*Id*. 38:17-39:7. In other words, though SCO would be functionally a shell company for operational purposes, it did retain sufficient assets to pursue the pending litigations, in particular the Utah Litigation as framed in the Second Amended Complaint.

45.    All of this testimony reinforces and is consistent with the understanding of the parties to the APA. Through the APA, SCO sold all of the Post-1995 developments and all of its rights in and claims regarding the ongoing business and operations of SCO to Xinuos so that Xinuos could protect the stability of that worldwide global server operating system market. And after that sale, SCO was left solely with assets sufficient to litigate the claims in the Second

Amended Complaint in the Utah Litigation, the Novell Litigation and the ancillary Red Hat and

SUSE actions (all of which involved the pre-September 19, 1995 copyrights).

46.      In light of this and similar testimony, the Court approved the APA.  *See* D.I. 1253.

## IX.    The Present Bankruptcy Action – Almost No Activity Between 2011 And Today

47.      After the APA was approved, almost no substantive activity took place in this

bankruptcy action.

48.      The only activity worth mentioning for present purposes is that, on August 16,

2012, the Trustee filed a motion to convert this Chapter 11 case to a case under Chapter 7.  *See*

D.I. 1419.  As noted at the hearing to approve the APA, SCO was no longer operational and had

no intellectual property assets.  *See* D.I. 1249, 34:5-25; 38:17-39:10.  So formally converting to

Chapter 7 was the appropriate step.  *See e.g.*, D.I. 1419 ¶ 9 (noting that conversion from Chapter

11 to 7 is appropriate where there is a "substantial or continuous loss to or diminution of the estate

and absence of a reasonable likelihood of rehabilitation") (citing 11 U.S.C. § 1112(b)(4)(A)).

49.      Notably, as part of this motion, the Trustee stated as follows:

> On April 11, 2011, the Debtors sold and conveyed to [Xinuos] the UNIX® system
> software product and related services business. There are no other assets in the
> Debtors' estates other than certain unfair competition and tortious interference
> claims asserted by the Debtors' estates against International Business Machines
> Corporation ("IBM") in an action [ ] currently pending in the District Court for the
> District of Utah [ ].

D.I. 1419, at 1-2.

50.      This representation by the Trustee simply further confirmed what had been made

express through the APA and during the hearing on the APA:  Xinuos owned all of the Post-1995

developments and all rights in and claims regarding the ongoing business and operations acquired

from SCO, and the only assets that SCO owned were those sufficient to allow it to litigate what

remained of the Second Amended Complaint in the Utah Litigation, the Novell Litigation, and the

Red Hat and SUSE actions (all of which involved the pre-September 19, 1995 copyrights).

X.    **The Virgin Islands Litigation**

51.    In 2019, Xinuos discovered that some portion of the Post-1995 proprietary UNIX developments that SCO developed in connection with Project Monterey and that Xinuos purchased through the APA were present in IBM's AIX server operating system products. *See* Snyder Decl. ¶ 36. After further investigation of these circumstances, Xinuos also discovered that competitors IBM and Red Hat were engaging in anticompetitive and unfair business practices, including joint action to divide the market between them and to exclude competitors, including Xinuos, from the market, and to illegally impair the ability of Xinuos' existing and new products (particularly the recent OpenServer 10 product) to compete in the market, as well as monopolization of the market generally. *See id.* ¶ 37.

52.    Given the need to protect its intellectual property position, to protect the market from exclusionary practices that harm consumer welfare, to protect its business and products, and to protect the very same customers, partners, and operating system ecosystem that animated the purpose of the APA in the first place, Xinuos was forced to initiate litigation in Federal Court against IBM and Red Hat. *See id.* ¶ 38. The Complaint in the Virgin Islands Litigation alleges that IBM infringed the copyrights that it owns in the Post-1995 UNIX and UnixWare developments, and that Red Hat and IBM took joint action to injure the market and competitors, including Xinuos, and its customers and partners, in violation of the federal antitrust laws and Virgin Islands anticompetition and unfair practices laws. *Id.*

XI.    **After Nearly A Decade Of Inaction – And Only After Xinuos Initiated The Virgin Islands Litigation – IBM And The Trustee Reach An Agreement With Overly Broad Releases**

53.    Before Xinuos initiated the Virgin Islands Litigation, it appears that there were no prospects for the Utah Litigation to settle or for this bankruptcy proceeding to ever close. *See generally* D.I. 1477-83 (only seven docket entries between Feb. 20, 2013 and Sept. 14, 2020.

There had simply been no action for years and no basis to think the parties would shift their positions. *Id.* Financing to take the Utah Litigation to trial was attempted in recent years, but apparently fell through. *See id.* 1483-85.

54.     Then, suddenly, on August 26, 2021, only a few months after Xinuos commenced the Virgin Islands Litigation, the Trustee filed the Motion and associated Proposed Settlement Agreement to which Xinuos now objects. *See id.* 1501. As described above, the Motion seeks approval of the Proposed Settlement Agreement, which includes broad releases that could be improperly read to encompass the Post-1995 Copyright Claims and Competition Claims that Xinuos filed in the Virgin Islands Litigation.

55.     Xinuos is deeply concerned that, having agreed to the mutually understood scope of the APA approximately a decade ago, now the Trustee is attempting to improperly broaden what the Debtors retained, in order to attempt to encompass Xinuos' claims in the Virgin Islands Litigation. And IBM apparently is driving this attempt, to avoid resolution of the Virgin Islands Litigation on the merits. This marriage-of-convenience that hopes to leave Xinuos out in the cold is entirely inappropriate. For the reasons below, as a matter of contract and as a matter of law, the Trustee cannot release IBM or any other party from Xinuos' Virgin Islands Litigation claims.

## **OBJECTION**

56.     The Motion must be denied because SCO has no right to release IBM or Red Hat from either the Post-1995 Copyright Claims or the Competition Claims and Xinuos has the sole and exclusive right to pursue those claims.

**I.      The Motion Must Be Denied Because The Proposed Settlement Agreement Contains Releases That Could Be Improperly Construed To Release IBM From The Post-1995 Copyright Claims**

57.     There are three separate reasons why the Trustee cannot release IBM from the Post-1995 Copyright Claims. First, the APA wholly and solely assigns to Xinuos the Post-1995 code,

copyrights, and rights to enforce those copyrights.  Second, as a matter of copyright law, the APA

cannot be construed to provide the right to enforce those copyrights to any party other than Xinuos.

Third, Xinuos did not grant any right to the Debtors to license or sublicense those copyrights to

any other party.  Each reason is taken in turn.

> **A.    The APA Establishes That Xinuos Alone Owns The Post-1995 Copyrights, Code Developments, And Rights To Protect These Property Interests—The Debtors Did Not Retain Any Such Rights Or Interests**
>
> > **1.    The Plain Language Of The APA States That Xinuos Alone Owns The Post-1995 Copyrights And Rights To Exploit And Sue For Infringement Of The Post-1995 Copyrights**

58.     The plain language of the APA states that the Post-1995 UNIX and UnixWare

developments and copyrights, and all exclusive rights under those copyrights, were wholly

assigned to Xinuos.  *See Phillips Home Builders v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del.

1997) ("When there is a written contract, the plain language of a contract will be given its plain

meaning.").  This complete assignment includes the right to sue others when the copyrights are

infringed—i.e., the assignment includes the Post-1995 Copyright Claims.

59.     The APA establishes this in § 2.1, where it states that the Acquired Assets

transferred to Xinuos include "[a]ll of [SCO's] assets (tangible or intangible), including those

assets set forth on Schedule 2.1(a), all Intellectual Property, including all copyrights developed

after 1995" as well as "[a]ll rights and claims of Seller against any third parties, directly arising

from or directly relating to the Acquired Assets."  D.I. 1216-1, § 2.1(a).  Accordingly, when SCO

sold "[a]ll" of its "assets (tangible or intangible)" to Xinuos, that necessarily included the Post-

1995 Copyright Claims.  The plain language assigning the "copyrights developed after 1995" and

associated claims make this clear.  An objective, reasonable party reading these terms would

understand the plain language in this way.  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159

(Del. 2010) ("Delaware law adheres to the objective theory of contracts, i.e., a contract's

construction should be that which would be understood by an objective, reasonable third party.").

60.     Of course, none of the Excluded Assets were sold to Xinuos as part of the APA. D.I. 1216-1, § 2.1(c).  But the Excluded Assets plainly do not include the Post-1995 copyrights, any rights in those copyrights, or the Post-1995 Copyright Claims.

61.     First, the Excluded Assets do not state that SCO retained the Post-1995 copyrights, any associated exclusive rights under the Copyright Act, any exclusive rights to royalties or licensing revenue flowing from such rights, or the right to sue on the Post-1995 copyrights that it had just sold to Xinuos.  Given that the Acquired Assets expressly establish that "all copyrights developed after 1995" are part of the transfer to Xinuos, it follows that if any portion of those same Post-1995 copyrights, or exclusive rights under the Copyright Act or associated exclusive rights to royalties or licensing revenues or rights to assert those copyrights were in fact *not* transferred, the APA would have made that explicit.  It did no such thing.  Thus, the only reasonable construction of the Excluded Assets language is that the Post-1995 copyrights were not "pending" as part of the Second Amended Complaint in the Utah Litigation or any other litigation and, upon assigning such copyrights to Xinuos, claims for infringement of such copyrights may not "be asserted in the future" by SCO.  *See Mrs. Fields Brand, Inc. v. Interbake Foods, LLC*, 2017 Del. Ch. LEXIS 113, at *51 (Del. Ch. June 26, 2017) ("If the parties had intended [certain matter], it is reasonable to assume they would have said so . . . They did not, which strongly suggests that they did not intend to . . . and which is consistent with the commercially logical result . . .").

62.     Second, the Excluded Assets do not somehow implicitly mean that Xinuos' purchase of the Post-1995 copyrights failed to include a fundamental and exclusive right to protect and enforce those newly purchased property interests.  As explained above, sub-provision (ix) of the Excluded Assets establish in part (B) that SCO retained the right to continue to litigate the operative claim in the Utah Litigation, the Novell Litigation and the Red Hat and SUSE disputes

(all involving pre-September 19, 1995 copyrights and code), and establish in part (C) that SCO
retained the right to sue Red Hat for Linux's infringement of pre-September 19, 1995 UNIX. *See*
D.I. 1216-1, Schedule 2.1(c)(ix). These provisions do not secretly encompass the much broader
exclusion of Xinuos not being allowed to protect and exclusively control its newly purchased
property. This would be an outstanding and unreasonable construction of the otherwise plain text,
which must be rejected. *See In re Northwestern Corp.*, 313 B.R. 595, 601 (D. Del. Bankr. 2004)
("An interpretation that leads to an absurd result is disfavored") (citing *Collins & Aikman Corp. v.
Compo Industries, Inc.*, 1982 Del. Ch. LEXIS 525 (Del. Ch. July 6, 1982)); *Axis Reinsurance Co.
v. HLTH Corporation*, 993 A.2d 1057, 1063 (Del. 2010) ("[T]he controlling rule of construction
is that where a contract provision lends itself to two interpretations, a court will not adopt the
interpretation that leads to unreasonable results, but instead will adopt the construction that is
reasonable and that harmonizes the affected contract provisions.").

63.     Indeed, this would be particularly unreasonable given that Xinuos was attempting
to avoid precisely the ambiguity that existed between SCO and Novell, *see* Snyder Decl. ¶ 32, and
that context matters. *See City Investing Co. Liquidating Trust v. Continental Casualty Co.*, 624
A.2d 1191, 1198 (Del. 1993) ("[I]f the words of the agreement can only be known through an
appreciation of the context and circumstances in which they were used a court is not free to
disregard extrinsic evidence of what the parties intended."). Simply put, the parties agreed to the
clear and exclusive assignment of the Post-1995 copyrights and rights to enforce those rights to
avoid that dispute that SCO encountered with respect to the pre-1995 copyrights.

64.     Finally, in case there was any doubt about the meaning of the APA, in 2012 the
Trustee made this clear in his motion to convert the bankruptcy action from Chapter 11 to Chapter
7. *See* D.I. 1419. In this motion, the Trustee states: "**[t]here are no other assets in the Debtors'
estates other than certain unfair competition and tortious interference claims** asserted by the

Debtors' estates against International Business Machines Corporation ("IBM") in an action [ ] currently pending in the District Court for the District of Utah [ ]." *Id* at 1-2 (emphasis added).

65.     The Trustee knew in 2012 that the Debtors solely retained the claims needed to litigate what remained of the Utah Litigation.  *Id*.  He cannot now turn around and say that the estate also retains the Post-1995 copyrights and Post-1995 Copyright Claims assigned to Xinuos.

**2.     The Intent Of The Parties To The APA Was To Assign Solely To Xinuos The Post-1995 Copyrights And Rights To Exploit And Sue For Infringement Of The Post-1995 Copyrights**

66.     Consistent with the plain text of the APA, the evidence of the intent of the parties further establishes that the Debtors did not retain the Post-1995 copyrights or rights to enforce the Post-1995 copyrights.  Sean Snyder, Xinuos' CEO, attests to this.  *See* Snyder Decl. ¶¶ 24-32.

67.     There are at least two reasons why the only reasonable conclusion is that the intent of the parties was to transfer to Xinuos all of the Post-1995 copyrights, including the exclusive rights under the Copyright Act and associated royalties, and the exclusive right to sue on those copyrights.  To the extent there is a dispute regarding interpretation of the agreement, the extrinsic evidence of intent demonstrates that this is so.  *See Harvey v. City of Newark*, 2010 Del. Ch. LEXIS 215, at *24-25 (Del. Ch. Oct. 20, 2010) ("complex documents must be read contextually, both in the sense that specific provisions must be read in context with the entire document, and in the sense that complex documents typically cannot be rationally understood without an appreciation for the particular political or business context in which they were adopted.").

68.     First, the whole point of the APA was to allow Xinuos to take over control of SCO's server operating system business.  The live testimony of Mr. Comer made this clear.  *See* D.I. 1249, 34:5-25 (all of SCO's intellectual property is "going to the buyer" and that SCO will have "no operating assets left" after the transfer); 38:17-39:10 ("the customer-facing operations and assets will go to the buyer").  It is not plausible that the parties intended Xinuos to take complete

control over SCO's business but to not possess the authority to protect the business's core intellectual property from infringement and to exclusively control that intellectual property. This would be cutting Xinuos at its knees before the business started and such a construction would make no sense in context. *See e.g. Chicago Bridge & Iron Company N.V. v. Westinghouse Electric Co.*, 166 A.3d 912 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract. That is true in all commercial contexts, but especially so when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business.").

69.     This also makes sense given the market context. As Mr. Broderick explained through live testimony, the APA needed to be approved because businesses around the world needed maintenance and service support to protect their business-critical server operating systems. *See* D.I. 1249, 65:13-25. Xinuos would not have been able to support the server operating system market if it could not protect its own assets.

70.     The Excluded Assets were not inserted into the APA to undermine Xinuos' ability to operate the server operating system business. They were included for the perfectly logical reason to protect SCO's rights to pursue what remained in the operative complaint in the Utah Litigation, the Novell Litigation and the ancillary Red Hat and SUSE actions—all involving pre-September 19, 1995 copyrights and code. This was the case because, as of early 2011 when the APA was drafted, the final appeal in the Novell Litigation to determine ownership of the pre-1995 code was still ongoing. This is precisely why in 2012—*after* the Tenth Circuit finally concluded that Novell, not SCO, owned the pre-September 19, 1995 copyrights and code—the Trustee stated definitively in his motion to convert to Chapter 7 that "[t]here are no other assets in the Debtors' estates other than certain unfair competition and tortious interference claims." D.I. 1419 at 1-2.

71.     Second, the license from Xinuos to SCO only makes sense if SCO did not retain

ownership of the UNIX and UnixWare assets, and associated copyrights, which were sold and assigned to Xinuos through the APA.  This license granted SCO a "non-exclusive . . . license to use" the Post-1995 developments that it had just sold to Xinuos.  D.I. 1216-1, § 2.2.  If SCO had already retained ownership of the Post-1995 developments and copyrights, then it simply makes no sense for SCO to need a license to use these same copyrights.  This provision would be a mere surplusage and such a construction must be rejected.  *See Veloric v. J.G. Wentworth, Inc.*, 2014 Del. Ch. LEXIS 178, at *24-25 (Del. Ch. Sept. 18, 2014) ("[The Court] should avoid interpreting a term in an unreasonable way that would yield an absurd result or that would render other contractual language superfluous.").

**B.     Well-Established Copyright Law Provides That Only The Legal Or Beneficial Owner Of Exclusive Rights Under The Copyright Act—Xinuos—Can Sue On That Copyright, And Thus Any Attempt By The Debtors To Retain The Right To Sue On The Post-1995 Copyrights Would Be Invalid**

72.     Federal copyright law only allows the legal or beneficial owner of a copyright to bring a claim on the basis of that copyright's infringement.  Indeed, Section 501(b) of the Copyright Act clearly defines under what circumstances a party has standing to bring a suit against infringing parties.  For a plaintiff to assert a claim for copyright infringement, it must be (1) the "legal or beneficial owner of an exclusive right under a copyright" and (2) entitled "to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).

73.     Federal Courts across the United States have reaffirmed this principle, holding that only the owner of copyrights or exclusive rights under the Copyright Act in such copyrights may file suit related to those copyrights.  *See e.g.*, *Vianix Del. LLC v. Nuance Communs., Inc.*, 2009 U.S. Dist. LEXIS 40992, *4-8 (D. Del. May 12, 2009) (only the legal or beneficial owner of copyrights may file suit on the copyrights); *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169-70 (9th Cir. 2013) (same); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884-87 (9th Cir. 2005)

("Congress' explicit listing of who may sue for copyright infringement should be understood as an exclusion of others from suing for infringement."); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."); *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011) ("[T]he Copyright Act spells out who has enforceable rights under the statute; someone who does may sue, and someone who does not has failed to state a claim upon which relief may be granted"); *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir. 1993) (licensing agent may not join infringement suit pursuant to § 501(b)); *Viesti Assocs. v. Pearson Educ., Inc.*, 2014 U.S. Dist. LEXIS 35939, at *18-21 (D. Colo. Mar. 19, 2014) ("[T]he weight of authority interprets § 501(b) as authorizing suit only by legal or beneficial owners").

74.      In particular, where the entirety of a copyright is assigned, it is not legally possible for the assignor, such as Debtors here, to retain a right to sue under the copyright.  *See e.g.*, *Fathers & Daughters Nev., LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1170 (D. Or. 2018) ("[T]he Ninth Circuit has repeatedly held that agreements and assignments cannot convey simply a right to sue, because a right to sue is not an exclusive right under the Copyright Act . . . If a party cannot transfer simply a right to sue, the Court finds that a party similarly cannot retain a simple right to sue.") (citing *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 987-88 (9th Cir. 2017)); *see also Crafty Prods. v. Fuqing Sanxing Crafts Co.*, 839 F. App'x 95, 98 (9th Cir. 2020) (where agreement transfers all of seller's assets including copyrights to buyer, seller cannot retain a "right to sue" on those copyrights).

75.      "In order to bring a claim, both legal and beneficial owners must show that they are the owners of at least one exclusive right set forth in § 106." *Viesti Assocs.*, 2014 U.S. Dist. LEXIS 35939 at *18-21; *Hyperquest*, 632 F.3d at 382 (same).  In particular, Section 106 of the Copyright Act defines "exclusive rights" as the rights (1) to reproduce copies of the copyrighted work; (2) to

prepare derivative works based upon the work; (3) to distribute copies of the work, (4) to perform

the work publicly, (5) to display the work publicly, and (6) to perform the work publicly by digital

audio transmission.  By contrast, "[t]he right to sue for an accrued claim for infringement is not an

exclusive right under § 106."  *Silvers*, 402 F.3d at 884.

76.      "Legal owners are those with legal title to at least one exclusive right" under the

Copyright Act.  *Viesti Assocs.*, 2014 U.S. Dist. LEXIS 35939, at *18-21 (citing *Silvers*, 402 F.3d

at 886).  Here, the Debtors fully assigned to Xinuos the entirety of the Post-1995 copyrights,

including registered and unregistered copyrights encompassing all of the foregoing exclusive

rights under Section 106.  The Debtors did not retain any exclusive right to reproduce, prepare

derivative works, distribute, perform, or display any copyrighted work.  Thus, Xinuos alone is the

"legal" owner of the Post-1995 copyrights and the Debtors are not the legal owners.

77.      "Beneficial owners are those without legal title, but with an interest in royalties or

licensing fees flowing from an exclusive right."  *Viesti Assocs.*, 2014 U.S. Dist. LEXIS 35939, at

*18-21 (citing *Silvers*, 402 F.3d at 886); *SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F.

Supp. 1053, 1062 (D.N.J. 1989) ("[T]he definition given to a beneficial owner includes an author

who had parted with legal title to the copyright in exchange for percentage royalties based on sales

or license fees.") (citation omitted); *see also Moran v. London Records, Ltd.*, 827 F.2d 180, 183

(7th Cir. 1987) (defining beneficial owner as one who has "the right to receive royalties from the

copyright's exploitation").  Here, the Debtors fully assigned to Xinuos the entirety of the rights to

royalties and licensing fees flowing from the Post-1995 copyrights, including registered and

unregistered copyrights encompassing all of the foregoing exclusive rights under Section 106 of

the Copyright Act.  The Debtors did not retain any exclusive right to receive royalties or licensing

fees flowing from one of the right to reproduce, prepare derivative works, distribute, perform,

display or perform any copyrighted work.  Thus, Xinuos alone is the "beneficial" owner of the

Post-1995 copyrights and the Debtors are not the beneficial owners.

78.     *Righthaven* is on point.  In *Righthaven*, contractual language purported to provide a party all rights "to seek redress for past, present, and future infringements of the copyright . . . in and to the Work" but that same party did not retain ownership of any exclusive right to reproduce, prepare derivative works or distribute copies of the work.  *Righthaven*, 716 F.3d at 1169-70.  Based on this contractual language, the Ninth Circuit held that because the party did not actually retain ownership of the copyrights or any exclusive right under the Copyright Act, it had no standing to sue on those copyrights, notwithstanding the language in the agreement purporting to provide that party with "all copyrights requisite" to accomplish filing of the suit.  *Id.*

79.     The Court should presume that the drafters of the APA intended for the contract to comply with longstanding and well-established copyright law.  *See Western Air Lines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145, 154 (Del. Ch. 1973) ("Contracts must be written and construed in light of generally accepted legal principles.").  The Court should thus find that the APA transferred the power to sue on the Post-1995 copyrights to Xinuos along with the copyrights and the constituent rights under the Copyright Act, all of which are exclusively held by Xinuos.

80.     However, if the Trustee nonetheless argues that the Debtors purport to retain the right to sue on the Post-1995 copyrights assigned to Xinuos and purport to exclude from the APA the power for Xinuos to sue on the Post-1995 copyrights that it was assigned, the response must be—for the reasons above—that such a construction is legally inoperative and unenforceable.

81.     Given the severability clause, this outcome would not cause the APA to collapse. Rather, as this clause states, "[i]f any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions hereof shall not be affected thereby and shall be enforceable without regard thereto."  D.I. 1216-1, § 10.9.  Thus, should the Trustee argue that the Debtors retained a bare right to sue, which would be a wholly unenforceable term, that term should

be severed and the remainder of the contract enforced.  *Hildreth v. Castle Dental Centers, Inc.*, 939 A.2d 1281, 1283–84 (Del. 2007) (Berger, J.) ("An invalid term of an otherwise valid contract, if severable, will not defeat the contract.").

**C.      The Asset Purchase Agreement Only Grants to the Debtors the Non-Exclusive Right to "Use" the Post-1995 Copyrights—The Debtors Were *Not* Extended Any Right To "License" or "Sublicense" The Copyrights.**

82.      The only right that the Debtors received regarding the Post-1995 copyrights was a "non-exclusive, royalty-free license to **use** the Intellectual Property transferred under this Agreement solely in connection with the exercise of its rights and performance of its obligations with respect to the Excluded Assets."  D.I. 1216-1, § 2.2 (emphasis added).

83.      Crucially, a non-exclusive license does not confer standing to the Debtors to sue on the Post-1995 copyrights.  *See MacLean Assoc., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) ("[A] nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee."); *Office for Planning & Architecture, Inc. v. City of Harrisburg*, 2020 U.S. Dist. LEXIS 219928, at *13 (M.D. Pa. Nov. 24, 2020) ("a nonexclusive license is not the equivalent of a transfer of ownership" and does not constitute "legal or beneficial" copyright ownership); *Granite Music Corp. v. Center St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 724 (W.D.N.Y. 2011) (same); *Viesti Assocs.*, 2014 U.S. Dist. LEXIS 35939, at *18-21 (same); *HyperQuest*, 632 F.3d at 382 (same).  As a consequence, the Debtors also cannot release any claim for infringement of the Post-1995 copyrights.  *See e.g. Viesti Assocs. v. Pearson Educ., Inc.*, 2014 U.S. Dist. LEXIS 35942, at *3 (D. Colo. Mar. 19, 2014) (party that was not legal or beneficial owner of copyright had not right "to initiate and settle lawsuits").

84.      In addition, given that the Post-1995 copyrights are indisputably not part of the Excluded Assets, it cannot be the case that the Debtors retained a license to resolve litigation claims regarding the Post-1995 works by licensing other works, as section 2.2 only extends the license

regarding "rights and . . . obligations with respect to the Excluded Assets."  D.I. 1216-1, § 2.2.

Thus, section 2.2 cannot be construed to include any right by the Debtors to extend licenses or

sublicenses to the Post-1995 copyrights.  This is the only reasonable interpretation consistent with

the APA's overall meaning and the context in which it was drafted.  *See Rexam Inc.*, 2015 Del.

Ch. LEXIS 297 at *7 (Court must "select the interpretation that better comports with the remaining

contents of the document").

85.    Any other construction of section 2.2 is not appropriate under Delaware law.  *See*

*Axis Reinsurance Co. v. HLTH Corporation*, 993 A.2d 1057, 1063 (Del. May 10, 2010) ("[T]he

controlling rule of construction is that where a contract provision lends itself to two interpretations,

a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt

the construction that is reasonable and that harmonizes the affected contract provisions.").

86.    Further, the non-exclusive license from Xinuos to the Debtors to "use" the

copyrights does not encompass the further right to license or sublicense other work.  "Use" of a

copyright under the APA means the non-exclusive right to reproduce, distribute, or make

derivative works of the copyrighted Post-1995 code in the context of the Utah Litigation, Novell

Litigation and Red Hat and SUSE disputes—for example, as evidence in those cases of SCO's

market success or the like.  But this is the only right that was extended.  *See* D.I. 1216-1, § 2.2.

87.    In copyright jurisprudence, the right to "use" and "sublicense" are separate and

distinct rights.  *See e.g. Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (concluding that an

express written agreement for the use of copyrighted material—one that provides that the licensor

retains ownership of the copyright and restricts the use of the copyrighted work—points away from

the existence of an implied license); *Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*, 2016 U.S.

Dist. LEXIS 106839, at *17 (D. Conn. Aug. 12, 2016) (observing that license contained separate

rights to "use" and "sublicense" copyrights).

88.     If Xinuos had granted a right to the Debtors to license or sublicense the Post-1995 copyrights to third parties, the parties would have had to state so explicitly.  *See In re BuildNet, Inc.*, 2002 Bankr. LEXIS 1851, at *17-18 (Bankr. M.D.N.C. Sep. 20, 2002) ("Under the Copyright Act, a licensee does not have the right to sublicense or assign unless expressly authorized."); *Reynolds v. Hearst Communs., Inc.*, 2018 U.S. Dist. LEXIS 35453, at *6-7 (S.D.N.Y. Mar. 5, 2018) ("non-exclusive licenses . . . permit licensees to use the copyrighted material" and "[a] non-exclusive licensee has no right to sell or to sublicense without express authorization.")

89.     It is also clear that the license to the Debtors to "use" the Post-1995 copyrights does not mean that the Debtors were extended the right to grant further "licenses" or "sublicenses" to any other party, because when the parties wanted to refer to extending licenses or sublicenses through another party, they used those terms.  Indeed, in the sentence immediately preceding the non-exclusive "use" license from Xinuos to the Debtors, the parties referred *specifically* to a separate "sublicense" to Novell-owned pre-1995 UNIX code, that was extended from Novell through the Debtors to Xinuos, and even attached a detailed sublicense agreement at Exhibit C. D.I. 1216-1, § 2.2; *see also id*. at 36-42 (Exhibit C, "Sublicense Agreement").

90.     If the parties had intended for Xinuos to grant back a right to the Debtors to extend "licenses" or "sublicenses" to third parties, they would have explicitly used those terms to do so, as they clearly knew how to deploy those terms and did so in an analogous context.  The fact that the parties chose to describe the Debtors license as a narrower license to "use" when they elsewhere referred to rights to "license" and "sublicense" others indicates that "use" does not and cannot mean the right to license or sublicense others.  *Williams Cos. v. Energy Transfer LP*, 2020 Del. Ch. LEXIS 229, at *29 n. 123 (Del. Ch. July 2, 2020) ("One principle of contract interpretation in Delaware is that the use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings.").

91.     It is settled Delaware law that where parties know how to use a term to explicitly

grant a right, such as rights to "license" or "sublicense," but instead employ a different term, the

contract must be interpreted not to include that right.  *See Textron v. Acument Global Technologies,*

*Inc.*, 108 A.3d 1208, 1220 (Del. Jan. 23, 2015) (Where one part of agreement explicitly provided

for particular division of rights and obligations, such division not applicable to other parts of

agreement where that language was not used; "It was [] reasonable for the Superior Court to

assume that the lack of a similar provision . . . suggests [] the parties['] . . . inten[t]."); *Roseton OL,*

*LLC v. Dynegy Holdings, Inc.*, 2011 Del. Ch. LEXIS 113, at *41 (Del. Ch. July 29, 2011) (same;

"[W]hen the parties intended to make a particular restriction applicable . . . they knew how to do

so and readily could accomplish that objective."); *In re Verizon Ins. Coverage Appeals*, 222 A.3d

566, 578 (Del. 2019) ("referring to [particular rights] elsewhere in the . . . policy demonstrates that

the parties knew how to expressly provide for [those rights] when that was intended").

92.     Thus, this general principle of contract interpretation has been applied in the context

of software copyright licenses.  *See e.g. Shugrue v. Cont'l Airlines, Inc.*, 977 F. Supp. 280, 286

(S.D.N.Y. 1997) (refusing to interpret agreement to include a particular copyright license term

where party knew how to use a particular term but did not do so; "when [party] wanted to transfer

only a license and when it wanted to retain rights to software, it knew how to do so."); *Mgmt. Sys.*

*Assocs., Inc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1172-73 (4th Cir. 1985) (when parties

wanted to grant "perpetual" license in some parts of agreement, but that term was not used to other

parts, license was not perpetual where that term was not used)

93.     "A copyright license must be interpreted narrowly" and "copyright licenses are

presumed to prohibit any use not authorized."  *PlayMedia Sys. v. Am. Online, Inc.*, 171 F. Supp.

2d 1094, 1099 (C.D. Cal. 2001) (citing *Apple Computer, Inc. v. Microsoft Corp.*, 759 F. Supp.

1444, 1451 (N.D. Col. 1991)).  Thus, courts cannot insert terms in copyright licenses that do not

exist. *See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 482-83 (5th Cir. 1981) (state law rules of contract construction are not preempted by federal law; however, application of state law to supply implied terms in copyright license would raise preemption question).

94.     Thus, in view of all of the foregoing, it would be particularly inappropriate to interpret the APA as granting any right to the Debtors to license or sublicense other works, given that such rights are not stated (even though the parties knew how to state such rights), such rights would make no sense in context, and any such interpretation would be contrary to the plain meaning and overall purpose of the APA.

95.     Accordingly, the APA must be construed not to extend any right to the Debtors to license or sublicense the Post-1995 copyrights to IBM or any other third party.

## II.     The Motion Must Be Denied Because The Proposed Settlement Agreement Contains Releases That Could Be Improperly Construed To Release IBM And Red Hat From The Competition Claims

96.     For three reasons, the Trustee also cannot release IBM or Red Hat from the Competition Claims.  First, the Competition Claims are, and always have been, Xinuos' claims. Second, if the Competition Claims are not third-party claims, then they were transferred to Xinuos through the APA.  And third, given that the APA was entered to protect global server operating system customers, it is not plausible that the parties also granted IBM and Red Hat a license to harm consumer welfare through the same legal instrument.

### A.     The Debtors Do Not Own The Competition Claims, And Thus The Trustee Cannot Release The Competition Claims

97.     The Trustee can only release the Debtors' claims, and the Proposed Settlement Agreement provides that the Trustee only intends to release the Debtors' claims.  *See* D.I. 1501-2 at 10 (stating that "the Trustee, for the Debtors" release IBM and Red Hat from certain claims).

98.     The Motion must be denied because the Proposed Settlement Agreement may be construed as releasing IBM and Red Hat from the Competition Claims even though the Debtors

do not own these claims.

**1.      The Competition Claims Are, And Have Always Been, Xinuos' Claims**

99.      The Competition Claims are described in the Virgin Islands Litigation Complaint. *See* Virgin Islands Litigation, D.I. 1.  They are based on Xinuos' allegations regarding IBM and Red Hat's unfair and anticompetitive behavior in the Unix/Linux server operating system market, which violates the federal antitrust and Virgin Island competition laws. *See id*. ¶¶ 184-229.

100.      Xinuos is able to bring these allegations because it has experienced this conduct first-hand in the market for long after the APA was signed, and based on its own investigation into these practices beginning in 2019. *See* Snyder Decl. ¶¶ 38-39.

101.      The fact that Xinuos purchased SCO's assets to become operational does not mean that Xinuos' activities that postdate the asset sale somehow retroactively becomes SCO's as well, in just the same way that Xinuos' acquisition of SCO's assets do not necessarily mean that Xinuos is now liable for SCO's debts that predate the purchase. *See e.g.*, *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 468 (3d Cir. 2006) ("Where one company sells or otherwise transfers all of its assets to another company, the latter is not normally liable for the debts and liabilities of the transferor."); *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986) (same).  SCO and Xinuos have never been the same entity, and the Competition Claims are decidedly related to experiences that Xinuos had in the Unix/Linux server operating system market.

102.      For example, Xinuos alleges that IBM and Red Hat have colluded to foreclose market competitors from access to existing server operating system customers. *See* Virgin Islands Litigation, D.I. 1 ¶¶ 90-96.  Xinuos has been exposed to these practices and as a result has not been able to gain customer traction with its core operating system products. *Id*. ¶¶ 138-49.

103.      Similarly, Xinuos alleges that IBM and Red Hat have taken concerted steps to exclude competitors, including Xinuos, from valuable business and technical resources that would

otherwise facilitate market growth and innovation and increase consumer welfare. *Id*. ¶¶ 97-103.

104.    And Xinuos alleges that but-for the anticompetitive business practices, and IBM and Red Hat's decision to exclude OpenServer 10 and related products from access to technical capabilities, OpenServer 10 would be more widely licensed by market consumers. *Id*. ¶¶ 125-37. Notably for purposes here, Xinuos developed OpenServer 10 after 2011, and the underlying technology was not created by SCO or its predecessors. *See* Snyder Decl. ¶ 37.

> **2.    If The Court Determines That The Competition Claims Are Not Third-Party Claims, Then They Were Acquired By Xinuos Through The APA**

105.    The outcome is no different if the Court concludes that the Competition Claims are related to the Debtors, as the APA provides that claims of this type were acquired by Xinuos.

106.    This is best understood through the text and structure of Schedule 2.1(c), sub-provision (ix). *See* D.I. 1216-1, Schedule 2.1(c)(ix).  Under Delaware law, both the text and the "structure and relationship of the parts of a contract reveal the drafters' intent." *JJS, Ltd. v. Steelpoin CP Holdings, LLC*, 2019 Del. Ch. LEXIS 1308, *13 (Del. CH. Oct. 11, 2019) (describing the whole-text canon); *Bobcat North America, LLC v. Inland Waste Holdings, LLC*, 2019 Del. Super. LEXIS 210, *24 (Del. Super. Ct. Apr. 26, 2019) (identifying "the only reasonable interpretation" of a provision "give [certain] structural relationships and the plain language").

107.    Sub-provision (ix) has three parts, each with a broader exclusion of claims.

108.    Specifically, part (A) excludes only SCO's claims against Xinuos related to the APA. *See id*., Schedule 2.1(c)(ix)(A).  Part (B) excludes claims that are "pending or may be asserted in the future" relating to IBM, Novell, and SUSE. *See id*., Schedule 2.1(c)(ix)(B).  And part (C) excludes "every claim of any nature whatsoever, known or unknown" relating to allegations that Linux violates UNIX. *See id*., Schedule 2.1(c)(ix)(C).

109.    Based on this construction of the structure of sub-provision (ix), the exclusion in part (B) of claims relating to IBM, Novell, and SUSE is not as broad as the exclusion in part (C).

110.     The text of the different parts of sub-provision (ix) can then elucidate how the exclusion in part (B) is narrower than in part (C).  *See Tang Capital Partners, LP v. Norton*, 2012 Del. Ch. LEXIS 161, *19 (Del. Ch. July 27 2012) ("The controlling indicator of [the parties' intent] is the plain meaning of the language used in the contract.").  For present purposes, it is sufficient to solely note that while part (C) expressly states that "unknown" claims relating to allegations that Linux violates UNIX are not part of the asset sale, the exclusion in part (B) does not refer to unknown claims.  *See id.*, Schedule 2.1(c)(ix)(B), (C).

111.     Under Delaware law, the decision to include the phrase "unknown" in part (C) and to not include the same phrase in part (B) must be treated by the Court as intentional.  *See e.g.*, *Impact Investments Colorado II v. Impact Holding, Inc.*, 2012 Del. Ch. LEXIS 215, *28 (Del. Ch. Aug. 31, 2012) ("Delaware law will not create contract rights and obligations that were not part of the original bargain . . . where . . . the contract could easily have been drafted to expressly provide for them.") (citation omitted); *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983) ("Delaware follows the well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions."); *Williams Cos.*, 2020 Del. Ch. LEXIS 229, at *29 n. 123 ("[T]he use of different language in different sections of a contract suggests that the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings.").

112.     Accordingly, based now on a construction of both the structure *and* text of sub-provision (ix), the exclusion in part (B) of claims relating to IBM, Novell, and SUSE is narrower than the exclusion in part (C) based at least on the fact that the exclusion in part (B) does not include "unknown" claims.  In other words, based on the text and structure of sub-provision (ix), SCO did not exclude from the asset sale unknown claims against IBM, Novell, and SUSE.

113.     The Competition Claims were not known to the parties to the APA.  It was not until many years later that these claims became known, after IBM and Red Hat had engaged in

anticompetitive activity and Xinuos experienced the impact, prompting Xinuos to complete its own independent investigation leading to the identification and understanding of those activities. *See* Snyder Decl. ¶ 37.  Moreover, many of the facts that formed the basis for Xinuos' causes of action occurred after 2011.  *See id.*  And notably, not a single document related to the asset sale, the Utah Litigation, the Novell Litigation, or the ancillary actions state or imply that there is a concern with IBM and Red Hat's joint anticompetitive practices or monopolization of the market.

114.    Accordingly, the Competition Claims were unknown when the APA was signed, and thus do not fall within part (B) of sub-provision (ix) of the list of the Excluded Assets.  These claims were thus acquired by Xinuos through the APA.  *See* D.I. 1216-1, § 2.1(a) (stating that Xinuos purchased "[a]ll of Seller's right, title and interest in and to all of the assets of the Business, except for the Excluded Assets").

115.    Finally, it is also worth stressing that sub-provision (ix) only excludes the "*Seller's* claims" from the asset sale.  *Id.*, Schedule 2.1(c)(ix) (emphasis added).  And section 2.1(c) of the APA states that the Excluded Assets "shall remain the property of Seller after Closing."  *Id.* § 21(c).  This language would not make sense if SCO did not already own or otherwise possess the claims at the time of the sale.  *See Cyber Holding LLC v. CyberCore Holding, Inc.*, 2916 Del. Ch. LEXIS 38, *14 (Del. Ch. Feb. 26, 2012) ("courts should not aspire to an illogical interpretation"). And it would not make sense for SCO to own or otherwise possess the Competition Claims at the time of the sale when those claims had not yet accrued.

### B.    The Parties Intended To Protect Server Operating System Consumers, Not To Permit Their Abuse By Antitrust Violators

116.    The purpose of the APA was to transfer SCO's assets to Xinuos so that a solvent entity could protect existing server operating system customers from harmful business interruptions.  This principle was reinforced on several occasions during the hearing on the APA.

117.    In the proffer for Mr. Comer, the Trustee's counsel stated that "it's critical for these

estates that the transaction before this Court goes forward without delay for the benefit of the software business, the debtors' employees, the debtors' customers, including various governments around the world, large financial institutions, large retailers, universities across the globe, and many others." D.I. 1249, 25:20-26:1.

118.    And Mr. Broderick stated during his cross-examination that the failure to approve the APA would be "pretty disastrous worldwide" because if the operating system business could no longer operate, then "small, medium, large corporations, retail outlets, government agencies, they [would be] up a creek for support.  If something happens to their operating system, they've got nobody to turn to." *Id.*, 65:13-25.

119.    This effort to protect server operating system customers and the operating system ecosystem is inconsistent with a construction of the APA that grants IBM and Red Hat a license to violate the federal antitrust laws.  *See* Snyder Decl. ¶¶ 33-35.

## **PRAYER**

Xinuos respectfully requests that the Court disapprove the Motion and enter a judicial declaration that the Trustee, on behalf of the Debtors, does not have the power to release the Post-1995 Copyright Claims or the Competition Claims, both of which Xinuos owns, and to grant Xinuos any such other relief to which it may be entitled.  Xinuos respectfully requests that the Court refuse to approve any proposed settlement agreement that in any way precludes Xinuos from raising in court the Post-1995 Copyright Claims or Competition Claims.

*-Signature Page to Follow-*

Dated: September 9, 2021

**ASHBY & GEDDES, P.A.**

*/s/ Ricardo Palacio*
Ricardo Palacio (I.D. #3765)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067
rpalacio@ashbygeddes.com

-and-

**CROWELL & MORING**
Gabriel M. Ramsey *(admitted pro hac vice)*
Kayvan M. Ghaffari *(admitted pro hac vice)*
Jacob Canter *(admitted pro hac vice)*
3 Embarcadero Center, 26th Floor
San Francisco, CA  94111
Telephone: (415) 986-2800
gramsey@crowell.com
kghaffari@crowell.com
jcanter@crowell.com

*Counsel to Xinuous, Inc.*